ROBERT SCHLESSINGER, DEFENDANT IN ERROR, v. FOR-
EST PRODUCTS COMPANY, PLAINTIFF IN ERROR.

Argued December 2, 1909—Decided June 20, 1910.

1. In order that a corporation may be bound by the acts of one as
   its agent, either upon the ground of an implied authority or of
   estoppel, it must appear that the corporation is chargeable with
   notice of the acts or omissions relied upon to establish such im-
   plied authority or estoppel.
2. Notice to the person who is alleged to have acted as agent for
   a corporation is not such notice to the corporation as will suffice
   to bind it to third persons upon the ground of implied authority
   to him to act as such agent or upon the ground of estoppel.
3. The doctrine of ratification is not applicable to a case where the
   person who makes the contract was not at the time, and did not
   profess or assume to be, acting on behalf of a principal.
4. Where a contract for the purchase of goods to be manufactured
   involves "personal confidence" it is not assignable by the vendor.

On error to the Hudson Circuit Court.

For the defendant in error, *John W. Queen.*

For the plaintiff in error, *Albert C. Wall.*

The opinion of the court was delivered by

Swayze, J. This is an action to recover commissions upon
a sale of staves said to have been made by the defendant com-
pany to one Gaffinel, a resident of France. A careful state-
ment of the facts is required to make the case clear. Victor
E. Freeman, in 1905, engaged in the business to which the
present defendant afterwards succeeded. He proposed to
organize a corporation to take over his business, and on No-
vember 4th, 1905, the defendant was incorporated in New
York state. The certificate named Freeman, Evans and
Griffin, the incorporators, as the directors for the first year,
but there was no formal meeting of the corporation or of the
directors until April 6th, 1906  Meantime there had been

negotiations by correspondence between the plaintiff and Freeman. The plaintiff's letters were addressed to the defendant. Freeman's replies were in his own name on stationery bearing the defendant's name as a heading. These negotiations resulted in a contract on January 10th, 1906, embodied in a letter of which the following is a copy:

"GENTLEMEN:—

"With reference to previous letters touching the question of commissions upon orders for staves for export, which letters have been found to be incorrect, I hereby cancel all those previous letters and conditions of same as relating to this subject, and in lieu thereof I beg to affirm that I am to pay you commission upon the order contracted with Mr. Christian Gaffinel, of Cette, France, of even date, for one million staves, at the rate of one and one-half dollars ($1.50) upon each one thousand staves, to be paid at the times of, and in proportion to the periodical part shipments, upon each payment by the consignee.

"Very truly yours,

"VICTOR E. FREEMAN."

Upon the same day a contract was made between Freeman and Gaffinel for the sale of staves to be manufactured. This was in form a written proposal by Freeman for himself, his heirs and assigns to sell through Schlessinger and deliver to Gaffinel one million staves; this proposal was signed by Freeman individually and accepted by Gaffinel. On January 11th, Schlessinger wrote the Forest Products Company calling their attention to the fact that the letter of January 10th referred only to the contract for one million staves, and that it was understood that if any further sale to the same party should be made, Schlessinger should be entitled to his commissions on that sale. There was evidence justifying a finding that this was assented to. A subsequent sale was made in June, 1906, which took the form of a written contract between Freeman individually and Gaffinel. Gaffinel afterwards refused to recognize anyone but Freeman in the transaction.

Only a portion of the staves was ever delivered and the commissions on the purchase price were paid by Freeman. There was evidence from which it might be found that Freeman was repaid this sum by the defendant.

On April 6th, 1906, at a meeting of the company, it was resolved to proceed to carry on the business for which it was incorporated. Freeman offered to transfer his business, including contracts for the delivery of staves, and the directors adopted a resolution which recited that it was the intention of the incorporators to purchase and take over the business now being carried on by Freeman, and proceeded to accept his offer and to authorize the issue of stock for the property to be transferred.

The learned trial judge charged the jury that the questions were (1) whether the contracts for the staves were made between Gaffinel and the company, or between Gaffinel and Freeman; (2) whether the contract for commissions was between Schlessinger and Freeman or between Schlessinger and the defendant company. On this point he added: "The question resolves itself into one of facts as to the intentions of the parties who were involved in this transaction. The question is whether it was the intention of Schlessinger and of Freeman, when these transactions took place, that the company should make the contract or whether it was the intention of Freeman and Schlessinger that Freeman individually should make the contract. If you shall determine that the intention was that Freeman should be bound, then of course the company cannot be liable and the verdict would have to be for the defendant. It is only when you shall have concluded that the intention of Freeman was to act for the company in performance of the power given to him to act for the company, that the plaintiff can recover."

He also charged that if Freeman was acting for himself the contract would be considered Freeman's contract and not the contract of the defendant unless the company at some later time adopted or assumed the contract, and that it was for the jury to determine whether the contract was that of the defendant through Freeman as agent or whether it was

adopted by the defendant subsequently by some unequivocal action.

In short, the plaintiff was allowed to recover either upon the theory of an original agency of Freeman or a subsequent adoption of Freeman's contracts by the company.

First as to Freeman's original agency. The fair interpretation of the charge under the facts of this case is that the defendant was liable if such was the intention of Schlessinger and Freeman. It is obvious that this leaves out the essential element of authority from the defendant to Freeman, either express or implied, from the defendant's conduct or arising out of estoppel. There is no evidence of express authority. The only evidence from which an implied authority could be inferred is the use of the name of the defendant on stationery and on the office door, and the only evidence to justify a finding that the defendant was estopped to deny Freeman's agency is the failure to call Schlessinger's attention to his error in addressing his communications to the defendant.

In order that the defendant may be bound by these acts and omissions which were acts and omissions of Freeman alone, it should appear that it was chargeable with notice thereof and failed to object. *Clement* v. *Young-McShea Amusement Co.*, 4 *Robb.* 677. Notice to Freeman was not notice to the company, although he was the active manager, since his interests in this respect were adverse to the company, for they would amount to an appointment of himself as agent without the knowledge of his associates. *First National Bank of Hightstown* v. *Christopher*, 11 *Vroom* 435; *Graham* v. *Orange County National Bank*, 30 *Id.* 225; *Sudbury* v. *Merchantville Building and Loan Association*, 12 *Dick. Ch. Rep.* 342. The company was not at the time these letters were written organized or prepared to do business. It had as yet done no business and necessarily therefore had done nothing to hold Freeman out as authorized to contract on its behalf. Freeman did not even hold himself out as agent, but wrote and signed all the letters as an individual, and in the letter of January 10th, 1906, canceled in so many words all previous letters which he writes had been found to be incor-

rect and in lieu thereof he distinctly says, "I am to pay you commission," and thereupon on the same day entered into the Gaffinel contract in his individual name. It would be difficult to show more clearly an intent to become individually responsible. Clearly that was his actual intent, for subsequently, on April 6th, 1906, he and the company agreed upon a transfer of his contracts for staves to the company in consideration of and payment for the stock issued to him, and the company by formal resolution recognized that the business was up to that time Freeman's business. The evidence fails to prove facts from which an agency can be implied or an estoppel to deny agency can arise.

The question of the adoption of the contract is a different one. No doubt the company did adopt as far as it could the contract with Gaffinel, and it is urged that it could not receive the benefit of the sale without at the same time incurring the burden of the contract for commissions. This does not follow. The two contracts were distinct, with different parties, and with different objects. If the company adopted the contract between Freeman and Schlessinger, it took the decidedly unusual course of adopting a contract which could only impose a burden upon it—the obligation to pay the commissions—and could be of no benefit since it was already executed on Schlessinger's part and the customer had already been secured. It is not likely that a precedent of that kind can be found. The contract between Freeman and Gaffinel is different and the company might well seek the advantage to be derived therefrom. The difficulty is that the doctrine of ratification is not applicable to a case where the person who makes the contract was not at the time, and did not profess or assume to be, acting on behalf of a principal. This subject has been recently discussed with thoroughness in the English courts, and the unanimous conclusion of the House of Lords establishes the rule above stated with most forcible arguments to which we have nothing to add. *Durant* v. *Roberts,* 1900, 1 *Q. B.* 629; *Keighley* v. *Durant,* 1901, *A. C.* 240. The necessary result is that even if there had been a contract for commissions between Schlessinger and

the defendant, those commissions were never earned since no contract of sale enforceable by the defendant was ever procured by the plaintiff.

The contract he procured was a contract with Freeman. Whether it could be assigned by Freeman to the defendant, so as to enable the defendant to enforce it as against Gaffinel, depends on whether the contract involved personal confidence between the vendor and vendee. Our Supreme Court has held that a contract for the sale of trees to be grown is assignable and the assignee may perform as the representative of the assignor. *Parsons* v. *Woodward, 2 Zab.* 196. The Queen's Bench in England has applied the same rule to an executory contract to repair wagons. *British Wagon Co.* v. *Lea, 5 Q. B. D.* 149; 49 *L. J. Q. B.* 321. The decision in the latter case is expressly put upon the ground that the repairs were of such a character that anyone might make them, and probably the court in the former case had in mind the fact that trees to be grown depended more upon the operation of natural forces than the skill of man. The courts have reached a different result where a personal element is involved. *Robson* v. *Drummond, 2 Barn. & Ad.* 303; *Humble* v. *Hunter,* 12 *Q. B.* 310; *Boston Ice Co.* v. *Potter,* 123 *Mass.* 28; *Arkansas Valley Smelting Co.* v. *Belden Mining Co.,* 127 *U. S.* 379; *Delaware County* v. *Diebold Safe Co.,* 133 *Id.* 473. The rule has recently been applied in our own Court of Chancery to a contract to publish school books. *Wooster* v. *Crane & Co., 3 Buch.* 22. The case is an especially strong one since the assignee was an Arizona corporation succeeding to the rights of the assignor, a New Jersey corporation with the same stockholders. The learned Vice Chancellor relied upon the fact that the complainant had the right to rely upon the safeguards provided by our Corporation act and could not be compelled to accept in lieu of her contract rights a claim against a corporation under the laws of another jurisdiction which might not provide the same safeguards.

The same rule has been applied by our Supreme Court to a case which manifestly involved personal confidence. *Peo-*

ples *Bank and Trust Co.* v. *Weidinger,* 44 *Vroom* 433. In *Tolhurst* v. *Associated Portland Cement Manufacturers,* 1903, *A. C.* 414, a contract for the supply of chalk for the manufacture of cement was held to be assignable by one corporation to another, but Lord Halsbury doubted and only yielded his assent because of the length of duration of the contract, the persons engaged in it and the nature of the contract itself, while Lord Robertson dissented. The decision was afterwards explained upon the ground that the contract for the supply of chalk for fifty years was to be treated as a contract for the supply to a given cement-making place, and not a personal contract. *Kemp* v. *Baerselman* (1906), 2 *K. B.* 604, 608. In the last case the defendant had agreed to sell eggs to Kemp, a cake manufacturer. Kemp turned over his business to a corporation of whose twenty thousand shares he owned all but seven. The Court of Appeal held that the defendant was thereby discharged from his obligation. In *New York Bank Note Co.* v. *Hamilton Bank Note, &c., Co.,* 180 *N. Y.* 280, a contract for the sale of printing presses with a New Jersey corporation was held not assignable to a West Virginia corporation organized to take over the business and contracts of the former.

Recently the question has been reviewed by the Supreme Court of North Carolina in an able opinion by Mr. Justice Hoke, in which the general rule was accepted but held not to be applicable to a contract between a railroad company and an individual for the cutting from the company's timber lands and the delivery on its right of way of a definite quantity of cord wood, which contract was not to be performed by the contractor personally and did not require or import any special reliance on his skill or business qualifications. *Atlantic and North Carolina Railroad Co.* v. *Atlantic and North Carolina Co.,* 147 *N. C.* 368; 15 *Ann. Cas.* 363. The notes to this case and to *Simmons* v. *Zimmerman,* 1 *Ann. Cas.* 850, collect the authorities. The injustice of permitting an assignment of a contract for personal services, for the painting of a picture, for a partnership, is obvious. A contract for the sale

of goods to be manufactured stands on similar grounds where the vendee relies upon the skill and experience of the manufacturer, as well as upon the implied warranty of quality. No man who has employed a tailor to make a suit of clothes ought to be compelled to accept a suit made by the tailor's assignee. As Lord Denman said (12 *Q. B.* 317) : "You have a right to the benefit you contemplate from the character, credit and substance of the party with whom you contract."

"In principle," says Pollock, "however, the intention of a contracting party is to create an obligation between himself and another certain person, and if that intention fails to take its proper effect, it cannot be allowed to take the different effect of involving him without his consent in a contract with someone else." *Poll. Cont.* (*7th Eng. ed.*) 467, 468. He adds (*p.* 471) that rights arising out of a contract cannot be transferred if they are coupled with liabilities, or if they involve a relation of personal confidence such that the party whose agreement conferred those rights must have intended them to be exercised only by him in whom he actually confided. In the present case Gaffinel relied in fact upon Freeman's personal performance of the contract, and was careful to stipulate that the staves should be hand-finished by European workmen. We think he was not compelled to accept performance from a corporation to whom it had been assigned. The fact that Freeman agreed for himself, his heirs and assigns, does not make the contract assignable so as to bind Gaffinel. Its object was to bind Freeman's heirs to liability in case of breach, and so far as concerns assigns is applicable only to the extent to which the contract might legally be assignable by Freeman; for example, an assignment by him of the money due for staves that might be actually sold and delivered. To hold that these words made the contract assignable in the wider sense would necessitate the conclusion that it might be performed by his heirs-at-law. A somewhat similar case arose in Wooster *v.* Crane & Co., cited above.

It cannot be inferred that the corporation, by taking an assignment of the Gaffinel contract, thereby assumed the liability of Freeman on the Schlessinger contract. The Gaf-

final contract was treated by the defendant and Freeman as a valuable asset of Freeman for which stock might properly be issued. The cost of procuring that contract was properly an expense for Freeman to pay; he had his reward in the stock issued to him.

There should have been a nonsuit and the judgment is reversed in order that a *venire de novo* may issue.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, VROOM, GRAY, DILL, CONGDON, JJ. 15.