A jury trial having been formally waived by the parties, the court heard the testimony and found the facts as follows:
1. The plaintiff is a corporation duly organized and existing under the laws of North Carolina.
2. The defendant is a corporation duly organized and existing under the laws of North Carolina.
3. On 1 September, 1904, the plaintiff made, duly executed, and delivered a lease to the Howland improvement Company. A copy of said lease is hereto annexed and made a part of these findings of fact. *Page 276 
4. The defendant succeeded to the rights and liabilities of the said Howland Improvement Company under said lease.
5. Previous to the execution of said lease the plaintiff used in its locomotives for the transportation of freight and passengers over its railroad wood as fuel, and for the purpose of supplying itself with a sufficient quantity of wood the plaintiff had purchased timber lands and standing timber and had entered into contracts with several persons for cutting timber, among others one B. W. Ives, for the cutting and delivery to plaintiff of 15,000 cords of wood; and in pursuance of said contract the said Ives, prior to the date of said lease, had cut and delivered large quantities of said wood to plaintiff, and at the time of the execution of said lease the contract between plaintiff and Ives was in regular course of performance by both parties thereto.
6. When the defendant took over the property of the plaintiff under the said lease all of the locomotives which it received were what (371) are known as "wood burners," and it was necessary to have an adequate supply of wood as fuel for said locomotives, and the defendant used in its railroad operations only those locomotives for several months, and used up large quantities of wood as fuel, including a portion of the wood cut and delivered to plaintiff by said Ives under said contract.
7. Some months after defendant had been in the operation of said railroad under the said lease it changed the locomotives from "wood burners" to "coal burners."
8. After the lease the defendant refused to carry out the wood contract with Ives or to take any wood from him under and in pursuance of said contract between the plaintiff and said Ives; thereupon the said Ives demanded of the plaintiff that it carry out said contract, and upon the failure of the plaintiff to perform said contract the said Ives, on 28 December, 1904, brought suit against the plaintiff for the breach of said contract,
9. Upon the institution of said suit the plaintiff notified the defendant to come in and defend the same, which the defendant declined to do, and the plaintiff undertook the defense of said suit and did defend it to the best of its ability and at considerable expense and cost, but judgment was finally awarded, both in the Superior and Supreme Courts, against the plaintiff and in favor of said Ives for the sum of $8,106.90, with interest and costs. In addition to said amount, the plaintiff was forced to pay the following amounts: Interest on said amount, $216.16; cost, Superior Court, $104.60; cost, Supreme Court, $23.55; attorney's fee, $700; amounting in all at the time of said payment to the sum of $9,147.21.
10. The defendant knew of the existence of said contract at the time *Page 277 
of the said lease, as shown by the paper-writing itself and the testimony of Rowland, Davidson, and Bryan.
11. Said contract was assignable and was duly assigned by the plaintiff to the defendant and was broken by the defendant.
12. Said contract between the plaintiff and B. W. Ives was not (372) in writing, nor was there any writing concerning same at the time of the making of the lease to the defendant.
13. The referee held that the defendant is liable to the plaintiff for the amount set out in paragraph 9 above, and that judgment be entered in favor of the plaintiff and against the defendant accordingly.
The portions of the lease referred to in the third finding of fact, pertinent to this inquiry, are as follows:
"Now, therefore, for and in consideration of the several sums of money, rents, covenants, agreements, and stipulations hereinafter specified and agreed to be paid, kept, and performed by the Rowland Improvement Company, the said lessor, namely, The Atlantic and North Carolina Railroad Company, has demised, let, hired, farmed out, and delivered, and by these presents doth demise, let, hire, farm out, and deliver to the said lessee, namely, The Howland Improvement Company, the entire railroad of the lessor, with all its franchises, privileges, rights of transportation, works, property, including among other things its superstructure, roadbed, and rights of way incident thereto, situated in the State of North Carolina and extending from Morehead City, in the county of Carteret, to the city of Goldsboro, in the county of Wayne, in the said State; and also all depots, houses, shops, piers, wharves, water fronts, water privileges, buildings, fixtures, engines, cars, and railroad equipment, and all franchises, rights and privileges and other things, if any, of whatsoever kind and nature, to the said lessor belonging and necessary, incident, and appurtenant to the free, easy, and convenient operation of the said railroad leased hereby and now or heretofore used in that behalf; and also including the property situated in the said Morehead City known as the Atlantic Hotel, with all its rights, privileges, hereditaments, and appurtenances, and the furniture, fixtures, equipments, and appliances now therein or used therewith, and also all lands and interests in lands, timber, timber rights, and contracts now owned by the lessor, for the full term of ninety-one (91) years (373) and four (4) months from and after the first day of September, 1904, and to be fully ended, commencing the first day of September, 1904."
And, further, a covenant of indemnity as follows:
"And the lessee further covenants to and with the lessor, its successors and assigns, to indemnify and save harmless the said lessor against and *Page 278 
from any and all damages which may be recovered from or against it, according to law, by reason of any failure of the said lessee, its agents, employees, successors or assigns to perform in all things, or its or their violation of their duties and obligations, whereby the lessor may become liable to any party injured or sustaining injury in his or her person, reputation, or property; and the lessor on its part covenants to and with the lessee that whenever any suit or action shall be instituted against it, the said lessor, for any causes of action for which the lessee would be liable to the lessor under the terms of this lease, the lessor will immediately give due notice and tender defense of such suit or action to the lessee, such notice to be given to the resident agent of the lessee at either of the following named places, to wit, Morehead City, New Bern, Kinston or Goldsboro, all in the State of North Carolina."
And further: "It is further agreed between the parties that all cash on hand and all bills and accounts receivable, due and payable to the lessor, at the date this lease goes into effect shall not pass by this conveyance, nor shall the lessee be liable for any debts of the said lessor at said date."
On the findings of fact and conclusions of law there was judgment for plaintiff, and defendant excepted and appealed.
(374) After stating the case: The contract by reason of which this recovery was had and its effect and binding force as between the original parties were construed and determined in Ives v. R. R., 142 N.C. 131, and it was there held that the contract was for the cutting and delivery to the present plaintiff on its right of way a specified amount of cordwood, and was not therefore within the statute of frauds requiring that contracts concerning land should be in writing. The judgment obtained by Ives in that case having been paid off and discharged, the plaintiff instituted this action to recover of the present defendant the amount of that judgment and the cost and reasonable expense incurred in defending the suit.
Such recovery is resisted on the grounds chiefly (1) that the contract in question was not assignable; (2) that as a matter of fact it was not assigned. But we are of opinion that neither position can be sustained.
While at common law the rights and benefits of a contract, except in the case of the law merchant and in cases where the crown had an interest, could not be transferred by assignment, a doctrine which Lord *Page 279 
Coke attributes to the "wisdom and policy of the founders of our law in, discouraging maintenance and litigation, but which Sir Frederick Pollock tells us is better explained as a logical consequence of the archaic view of a contract as creating a strictly personal obligation between the debtor and creditor," the rule in its strictness was soon modified in practical application by the common-law courts themselves and more extensively by the decisions of the courts of equity; and the principles established by these cases have been sanctioned and extended by legislation until now it may be stated as a general rule that, unless expressly prohibited by statute or in contravention of some principle of public policy, all ordinary business contracts are assignable, and that actions for breach of same can be maintained by the assignee in his own name.
The general doctrine as to the assignability of rights is very well (375) stated in 3 Pomeroy Eq. Jur., sec. 1275, as follows:
What Things in Action Are or Are Not Assignable. — it becomes important, then, in fixing the scope of the equity jurisdiction, to determine what things in action may thus be legally assigned. The following criterion is universally adopted: All things in action which survive and pass to the personal representatives of a decedent creditor as assets, or continue as liabilities against the representatives of a decedent debtor, are in general thus assignable; all which do not thus survive, but which die with the person of the creditor or of the debtor, are not assignable. The first of these classes, according to the doctrine prevailing throughout the United States, includes all claims arising from contract, express or implied, with certain well defined exceptions; and those arising from torts to real or personal property and from frauds, deceits, and other wrongs whereby an estate, real or personal, is injured, diminished, or damaged. The second class embraces all torts to the person or character, where the injury and damage are confined to the body and the feelings; and also those contracts, often implied, the breach of which produces only direct injury and damage, bodily or mental, to the person, such as promises to marry, injuries done by the want of skill of a medical practitioner contrary to his implied undertaking, and the like; and also those contracts, so long asthey are executory, which stipulate solely for the special personal
services, skill, or knowledge of a contracting party."
And an interesting and well considered article by Prof. Frederick C. Woodard on the assignability of contracts will be found in 18 Harvard Law Review, 23. There is an exception, as indicated in the last part of this citation from Pomeroy, to the effect that executory contracts for personal services involving a personal relation or confidence between the parties cannot be assigned. Lawson on Contracts, sec. 355. And another, equally well established and well-nigh as broad as the rule itself, *Page 280 
(376) is that executory contracts imposing liabilities or duties which in express terms or by fair intendment from the nature of the liabilities themselves import reliance on the character, skill, business standing or capacity of the parties cannot be assigned by one without the assent of the other. This last exception and the reason upon which it rests are stated by Justice Gray, delivering the opinion in Delaware v. Diebold,133 U.S. p. 488, as follows: "A contract to pay money may doubtless be assigned by the person to whom the money is payable, if there is nothing in the terms of the contract which manifests the intention of the parties to it that it shall not be assignable. But when rights arising out of contract are coupled with obligations to be performed by the contractor and involve such a relation of personal confidence that it must have been intended that the rights should be exercised and the obligations performed by him alone, the contract, including both his right and his obligations, cannot be assigned without the consent of the other party to the original contract," citing Arkansas Co. v. Belden Co., 127 U.S. 379. And the same principle is stated in Clark on Contracts, 364: "It may be said generally that anything which involves a right of property is assignable, with the exception that rights, when coupled with liabilities under an executory contract for personal service or under contracts otherwise involving personal credit, trust or confidence, cannot be assigned." It is contended that by reason of those exceptions stated in the authorities referred to, the contract before us was not assignable so as to impose liability of performance on defendant lessee; but we think the position is not well taken. In the first place, the exception noted arises for the protection of the other party, and if such party assents, as he did in this instance, the restriction no longer exists. But, apart from this, it will be noted that the exception referred to does not arise or apply when the contract is entirely objective in its nature, and gives clear (377) indication that the personality of the other contracting party was in no way considered. Anson on Contracts, p. 288; Clark on Contracts, p. 360. And this limitation imposed on the exception itself is applied and extended in numerous and well considered decisions of courts of the highest authority. Horner v. Wood, 23 N.Y. 350; Devlin v. City,63 N. Y., 8; New York v. R. R., 113 N.Y. 311; Lantern Co. v. Stile's,135 N. Y., 209; St. Louis v. Clement, 42 Mo., 69; Galey v. Mellon, 172 Pa. St., 433; Tolhurst v. Cement Co., H. L. App. Cases (1893), p. 414;Wagon Co. v. Lea, 5 L. R. Q. B., 1879-1880, 149.
In Devlin v. New York, supra, the general principle we are discussing is stated and applied as follows:
"1. Where an executory contract is not necessarily personal in its character, and can, consistent with the rights and interests of the adverse *Page 281 
party, we fairly and sufficiently executed as well by an assignee as by the original contractor, and where the latter has not disqualified himself from a performance of the contract, it is assignable.
"2. The assignment by the contractor with a municipal corporation for work is not against public policy so long as the corporation retains the personal obligation of the original contractor and his sureties; and in the absence of anything in the statute which authorized the work prohibiting it, such an assignment is valid. It does not terminate the contract or authorize the corporation to repudiate it.
"3. Accordingly held that an assignee of a contract for street cleaning, made between the corporation of the city of New York and another under authority of the act entitled `An act to enable the supervisors of the county of New York to raise money by tax for city purposes and to regulate the expenditure thereof,' etc. (ch. 509, Laws 1860), could maintain an action against the city for money due thereon and for damages resulting from a repudiation of the contract and an interference on the part of the city authorities, preventing a further performance." (378)
In Wagon Co. v. Lea, supra, Chief Justice Cockburn, delivering the opinion, discusses the principle as follows: "We entirely concur in the principle on which the decision in Robson v. Drummond (1) rests, namely, that where a person contracts with another to do work or perform service, and it can be inferred that the person employed has been selected with reference to his individual skill, competency, or other personal qualification, the inability or unwillingness of the party so employed to execute the work or perform the service is a sufficient answer to any demand by a stranger to the original contract of the performance of it by the other party, and entitles the latter to treat the contract as at an end, notwithstanding that the person tendered to take the place of the contracting party may be equally well qualified to do the service. Personal performance is in such a case of the essence of the contract, which consequently cannot in its absence be enforced against an unwilling party. But this principle appears to us inapplicable in the present instance, inasmuch as we cannot suppose that in stipulating for the repair of these wagons by the company — a rough description of work which ordinary workmen conversant with the business would be perfectly able to execute — the defendants attached any importance to whether the repairs were done by the company or by any one with whom the company might enter into a subsidiary contract to do the work. All that the hirers, the defendants, cared for in this stipulation was that the wagons should be kept in repair; it was indifferent to them by whom the repairs should be done. Thus, if without going into liquidation or assigning these contracts the company had entered into a contract with *Page 282 
any competent party to do the repairs, and so had procured them to be done, we cannot think that this would have been a departure from the terms of the contract to keep the wagons in repair. While fully acquiescing in the general principle just referred to, we must take care (379) not to push it beyond reasonable limits. And we cannot but think that in applying the principle the Court of Queen's Bench, in Robsonv. Drummond (1), went to the utmost length to which it can be carried, as it is difficult to see how in repairing a carriage when necessary, or painting it once a year, preference would be given to one coach-maker over another. Much work is contracted for which it is known can only be executed by means of subcontracts; much is contracted for as to which it is indifferent to the party for whom it is to be done whether it is done by the immediate party to the contract or by some one on his behalf. In all these cases the maxim, Qui fact per aliumfacit per se, applies."
It will be noted here that while the case of Robson v. Drummond, frequently cited in support of the position that contracts imposing liabilities cannot be assigned, is not overruled, there is decided intimation that it has gone too far in the application of this principle, and there is doubt if Ice Co. v. Potter, 123 Mass. 28, is not subject to the same criticism. Certainly neither one of these cases can, it seems to us, be supported, except on the theory that there were terms in the contract importing reliance on the personal skill, business standing or methods of the other contracting party. A correct application of the principle established by these cases leads to the conclusion that the contract in question was assignable. It was an ordinary business contract for the delivery of so much cordwood on the lessee's right of way, not requiring or importing any special reliance on Ives' skill or business qualifications. It could be performed as well by one man as another. As a matter of fact, there is testimony to the effect that it was to be done in this instance by convicts and that quarters had already been constructed for their protection and accommodation while doing the work. As said by Justice Walker in the opinion in Ives v. R. R., supra, "It was a contract of employment in the sense that it was to be performed by means of personal labor, but (380) not in the sense that it was expected or intended that it should be performed by Ives." Nor did the credit or business responsibility of the original parties affect the matter one way or the other; not that of Ives, for the wood was not to be paid for till it was delivered, and so the defendant assignee was fully protected; nor that of the assignor, for unless Ives had agreed to accept the defendant's responsibility. in stead and place of the assignor, making it a new contract by way of novation, the assignor would, notwithstanding the assignment, *Page 283 
still remain liable. Crane v. Kildorf, 91 Ill. 567; Martin v. Orndorff,22 Iowa 447. And see the article of Professor Woodard, supra, wherein it is shown that the assent of the other party to an assignment does not always necessarily import that the assignor is relieved of liability.
This, ordinarily, is all the books mean when they state the proposition in general terms that a contract imposing liability cannot be assigned; that the assignment of such a contract does not, as a rule, relieve the assignor from responsibility. It may be well to note that we are speaking of the assignment of the contract and not of the transfer of the property about which parties may have contracted. In the last case it is a generally accepted doctrine that, in the absence of an agreement, express or implied, a party who buys property from a vendee, to whom the owner has contracted to sell it, does not, as a rule, come under personal obligation to the owner to pay the purchase price. Adams v. Wadhams, 40 Bar., 225; Comstockv. Hitt, 37 Ill. 542. We have so held in effect at the present term inBiggers v. Matthews, ante, 299.
The contract in question here, being for the delivery of so much cordwood on defendant's right of way, may be classed with a contract of sale of a given quantity of staple goods having a known market value, and, under the principle established by the authorities referred to, we hold that it was assignable, so as to impose on defendant the (381) obligation to pay for the wood when delivered according to its terms.
And we are also of the opinion that by the terms of the lease the contract was, and was intended to be, assigned. The operative words of the lease are that the parties of the "first part do demise, let, hire, farm out, and deliver to the said lessee, etc., the franchise, property, etc., of the lessor for the full term of ninety-one years and four months from and after the first day of September, 1904." And the descriptive words as to the property passed included the franchise, works, property, right of way, etc., appertaining to the railroad; also the Atlantic Hotel property, with all its rights, privileges, hereditaments, and appurtenances, and the furniture, etc., used therewith; and, in reference to the matter now before us, "also all lands and interests in lands, timber, timber rights and contracts now owned by the lessor," etc. There was testimony to the effect, and it was found as a fact by the trial judge:
"5. That previous to the execution of said lease the plaintiff used in its locomotives for the transportation of freight and passengers over its railroad wood as fuel, and for the purpose of supplying itself with a sufficient quantity of wood the plaintiff had purchased timber lands and standing timber and had entered into contracts with several persons for cutting timber, and among others one B. W. Ives, for the cutting and delivering to plaintiff of 15,000 cords of wood; and in pursuance of said *Page 284 
contract the said Ives, prior to the date of said lease, had cut and delivered large quantities of said wood to plaintiff, and at the time of the execution of said lease the contract between plaintiff and Ives was in regular course of performance by both parties thereto.
"6. That when the defendant took over the property of the plaintiff under the said lease all of the locomotives which it received were what are known as `wood burners,' and it was necessary to have an adequate supply of wood as fuel for said locomotives; and that the defendant used in its railroad operations only those locomotives for several (382) months and used large quantities of wood as fuel, including a portion of the wood cut and delivered to plaintiff by said Ives under said contract.
"7. That some months after defendant had been in the operation of said railroad under the said lease it changed the locomotives from `wood burners' to `coal burners.'"
It is well recognized that the object of all rules of interpretation is to arrive at the intention of the parties as expressed in the contract, and that in written contracts which permit of construction this intent is to be gathered from a perusal of the entire instrument. In Paige on Contracts, sec. 1112, we find it stated: "Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole." And while in arriving at this intent words are prima facie to be given their ordinary meaning, this rule does not obtain when the "context or admissible evidence shows that another meaning was intended." Paige, sec. 1105. And further, in section 1106 it is said that the context and subject-matter may affect the meaning of the words of a contract, especially if in connection with the subject-matter the ordinary meaning of the term would give an absurd result. Again, as said by Woods, J., in Merriam v. United States,107 U.S. 441, "In such contracts it is a fundamental rule of construction that the courts may look to not only the language employed, but to the subject-matter and surrounding circumstances. and may avail themselves of the same light which the parties possessed when the contract was made." And in Beach on Modern Law Contracts, sec. 702, the author says: "To ascertain the intention, regard must be had to the nature of the instrument itself, the condition of the parties executing it, and the objects they had in view. The words employed, if capable of more than one meaning, are to be given that meaning which it is apparent the parties intended them to have." Applying these accepted (383) rules of construction, and considering the facts and attendant circumstances established by the parol testimony, which was properly *Page 285 
received for the purpose indicated (Ivey v. Cotton Mills, 143 N.C. 189;Ward v. Guy, 137 N.C. 397), we are of the opinion that the contract with Ives for the cutting and delivering of the cordwood came within the descriptive terms of the lease and was assigned to the lessee as stated. It is true that the terms "demise" and "let" are usually applied to leases and conveyances of real estate, but they both contain the idea of a grant; and when, as in this instance, the parties have used them as the operative words applied to a transfer of timber rights and contracts, passing such interest for ninety-one years and more, by fair interpretation and considering the nature of the interests, the parties could only have intended an assignment. And the term "contracts" in the descriptive words must have included this contract with Ives to cut cordwood. Referring to the parol testimony competent for the purpose stated, this and another contract with Overman of like nature were all the contracts of this kind they had. The terms "land," "timber," and "timber rights" included all the standing timber, and these two contracts to cut cordwood were the only interests on which the words could operate. The evidence, too, further shows that these two contracts were brought to the attention of the lessee before the contract was entered into; that the one here in question was being carried out by Ives at the time of the lease, and its benefits were for a short while accepted by the lessee. We do not attach any importance to the words "now owned by the vendors," at the conclusion of the descriptive words. The rights and benefits of a contract like this are considered as property, and the term "owned by them" is not inapt as a part of the description. Thurber v. LaRoque, 105 N.C. 306.
And so, as to the words "timber," ordinarily this term applies to timber fitted for structural purposes, hut it would be entirely improper to give it that significance when the testimony shows that the entire purpose of these holdings and contracts concerning them was to supply (384) cordwood for the operating purposes of the railroad. And we think it a fair surmise, permissible in view of the facts and attendant circumstances, that if the lessee had not decided to change its engines from wood to coal burners this litigation would never have arisen.
If we are correct in our position that the contract was assignable, and that as a matter of fact it was assigned, then we are of opinion that plaintiff has the undoubted right to recover of the defendant the amount of the judgment, together with the cost and reasonable attorney's fees incurred in resisting the suit instituted by Ives. Though the lessee may have repudiated any and all obligations to Ives by reason of this contract, the lessor was not thereby relieved of the obligation to do what was reasonably required to resist recovery. Tillinghast v. Cotton Mills, *Page 286 143 N.C. 268; Bowen v. King, 146 N.C. 385. And defendant's obligation, we think, arises by the express covenant of the lease, in which it is evidently contemplated that resistance to such suits should be made whenever the facts and conditions offered reasonable grounds of defense. One of the stipulations of the lease (page 47, record) provides as follows: "And the lessee further covenants to and which the lessor, its successors and assigns, to indemnify and save harmless the said lessor against and from any and all damages which may be recovered from or against it, according to law, by reason of any failure of the said lessee, its agents, employees, successors or assigns to perform in all things, or its or their violation of their duties and obligations whereby the lessor may become liable to any party injured or sustaining injury in his or her person, reputation, or property; and the lessor on its part covenants to and with the lessee that whenever any suit or action shall be instituted against it, the said lessor, for any causes of action for which the lessee would be liable to the lessor under the terms of this lease, the lessor will (385) immediately give due notice and tender defense of such suit or action to the lessee; such notice to be given to the resident agent of the lessee at either of the following named places, to wit: Morehead City, New Bern, Winston, or Goldsboro, all in the State of North Carolina."
When the defendant bought and took an assignment of this contract for the delivery of so much cordwood on its right of way, and thus acquired the right to enforce performance by Ives or recover damages for its breach, it assumed the liability to pay for it when delivered. It could not take over the benefits of the contract without bearing its burdens. Defendant took the contract cum onere (R. R. v. Bank, 42 Neb. 469; Smith v. Rodgers,14 Ind. 224); and having in the stipulations quoted agreed to "save lessor harmless from any and all recovery that may be had against the lessor by reason of the failure of the lessee and its assigns to perform in all things their duties and obligations," the liability to repay the amount comes within the express terms of the covenant of indemnity; and, having duly notified the lessee of the institution of the Ives suit and "tendered the defense," the reasonable expenses of such defense may also be recovered. The words of this stipulation, "to indemnify against any and all damages which may be recovered against it, according to law, by reason of its failure to perform in all things tile duties and obligations, whereby the lessor may become liable," etc., are broad enough to include this obligation to Ives. And if it were otherwise — if, as defendant contends, the covenant was only intended to apply to the charter obligations of these companies — the result would be the same; for while, as heretofore stated, the lessor company was not relieved of the obligations under this contract unless Ives had agreed to accept *Page 287 
the lessee in discharge of the former as between these parties, the lessor and lessee, the force and effect of the assignment were to establish in any event primary liability in the lessee; and under the general equitable principles of indebitatus assumpsit the lessor, having been forced to pay, can recover of the lessee the amount of this (386) enforced recovery. Keener on Law Quasi Contracts, p. 396; 15 A. E. Enc., 1108.
In the citation from Keener, supra, it is said: "It may be stated as a general proposition that a plaintiff can recover against a defendant as for money paid to his use to the extent that the claim paid by the plaintiff should have been paid by the defendant." This primary liability of the assignee is well brought out in the case of Cutting Pocking Co. v. Packers'Exchange, 86 Cal. 574, reported in 10 L.R.A., p. 396. In that case, speaking of the obligation of parties to an imperfect assignment as between themselves, Works, J., for the Court, said: "We therefore think it plain that, as the plaintiff, as assignor, was still bound to Blackwood to pay the price stipulated in the contract, notwithstanding the assignment, and as the defendant, as assignee, assumed such obligations, the plaintiff, as between it and defendant, stood in the nature of a surety for the latter for the performance of the obligation. If this be correct, it then follows that from the assignment an implied contract arose between the plaintiff and defendant whereby the latter became bound to the former to receive and pay for the apricots according to the terms of the original contract." While this ruling was made to depend to some extent on a section of the California Code, the statute itself is only an embodiment of the generally accepted doctrine applicable to the facts indicated.
The assignment of the Ives contract having established as between the parties a primary liability on the part of the defendant lessee, the obligations of that contract would not by any fair or correct interpretation be included under the later stipulation of the lease, "that defendant shall not be liable for any debt of the lessor at that date." This obligation, by the force and effect of the lease and assignment, had become the debt primarily of the lessee. And for the same reason the doctrine stated in general terms by Mr. Elliott in his valuable work on railroads (section 461), to which we were referred by counsel, (387) "that a lessee, under an authorized lease, is not liable on the contracts of the lessor in the absence of a stipulation to that effect," does not apply here. This is true when the lessee takes over the franchise and ordinary property of the lessor, without more; but in the case before us the lessee has taken the contract, thereby imposing on itself the obligation as a primary liability. And this distinguishes the present case *Page 288 
from that of Pennsylvania Co. v. R. R., 108 Pa., 621. In that decision it was held that an oral agreement by the lessee company to give an annual pass in consideration of a release of a right of way through an owner's land was not binding on the lessee. The decision was put on the ground that, while the right of way which had been obtained by the lessor company passed under the lease, there was no connection between the two so as to make them concurrent and dependent stipulations, and therefore in taking over the road, including the right of way, there was not any implied agreement to make good the oral promise to give a pass. The opinion (on page 629) proceeds as follows: "But the parol agreement to provide a pass was no part of the release; the latter was an executed contract, absolute and unconditional in its terms, and the transfer of it, in the absence of an express provision to the contrary, carried with it to the transferee no legal responsibility to the former. Each, it is true, was the consideration of the other, but they were distinct and independent; one secured a right, whilst the other evidenced a debt of the company." This decision will certainly not extend or apply to the facts presented here, where, as stated, a primary liability of the lessee company was assumed and established by taking over a contract having mutual and dependent stipulations.
The objection to the testimony of one who had been of counsel for Howland, the original lessee, as to the fact that the Ives contract was mentioned and referred to at the time of taking the lease, is (388) without merit. This was a fact necessarily known to both parties, brought out during their negotiation concerning the lease, and could in no sense be considered a confidential communication. Weeks on Attorneys, 289; Wigmore Evidence, 2311, 2312; 23 A. E., 67;Elliott v. Elliott, 92 N.W. 1008, citing with approval Hills v. State,61 Neb. 598, reported in 57 L.R.A., 155.
After giving the case most careful consideration, we find no error in the record, and the judgment below must be
Affirmed.
 Cited: Younce v. Lumber Co., 148 N.C. 36; Price v. Griffin,150 N.C. 527; Bailey v. Bishop, 152 N.C. 386; Refining Co., v. ConstructionCo., 157 N.C. 280; Bank v. Justice, ib., 376; Sanitarium Co. v. Ins. Co.,ib., 555; Winslow v. White, 163 N.C. 32; Herring v. Lumber Co., ib., 486;Simmons v. Groom, 167 N.C. 275; Bank v. Furniture Co., 169 N.C. 181;McMahon v. R. R., 170 N.C. 459; Bank v. Bedwine, 171 N.C. 67. *Page 289