## OVERBY et al. v. MONA MARIE TRUST. (No. 10101.)

(Court of Civil Appeals of Texas. Fort Worth. March 4, 1922. Rehearing Denied April 8, 1922.)

1. **Assignments** ⬅19—**Contract to drill oil well held not to call for personal skill and assignable.**

Where a trust owning an oil lease entered into a contract with two individuals to drill wells on the lease for half of the trust stock to be delivered after completion of the wells, and made one of those individuals a trustee, though not required to do so by the contract, and the evidence showed that the individuals were not well drillers, so that there was no reliance placed on their skill, the contract did not call for the personal services of the individuals, and could be assigned by them to another.

2. **Mines and minerals** ⬅74—**Buyer of interest in lease need not disclose knowledge of producing well on adjoining lands.**

A party negotiating for an interest in an oil lease from those with whom he stood in no fiduciary relation is under no obligation to disclose to his vendors the fact known by him that a well on an adjoining lease had just struck oil.

3. **Mines and minerals** ⬅74—**Evidence held to show statement to purchaser of interest in oil lease was not fraudulent.**

Evidence that the purchaser of an interest in an oil lease was informed by the driller of a well on adjoining premises at which oil had just been struck that he would not have been allowed on the premises if he had been seen in time, and that the driller intended to keep visitors away from the well in the future, shows that a statement, made by the purchaser to his vendor, when the latter suggested going by that well, that it would be useless because visitors were not allowed there, was not fraudulent.

### On Motion for Rehearing.

4. **Appeal and error** ⬅863—**Merits are not to be determined on review of temporary injunction.**

On appeal from a refusal to dissolve a temporary injunction, the appellate court will not pass upon the merits of the case, but will only consider the facts to determine whether the trial court in the exercise of his discretion should have dissolved the writ.

Appeal from District Court, Wichita County; E. W. Napier, Judge.

Suit by the Mona Marie Trust against Joe Overby and others. From an order denying motion to dissolve a temporary injunction, defendants appeal. Reversed, and injunction vacated.

Bullington, Boone, Humphrey & Hoffman, of Wichita Falls, for appellants.

Fitzgerald & Hatchitt, of Wichita Falls, for appellee.

BUCK, J. This suit was brought by W. E. Priddy and J. B. Hatchitt, trustees for the unincorporated trust estate known as the Mona Marie Trust Company, against J. H. Renfro, Joe Overby, and Jim Parker, for an injunction and damages. Upon a presentation of the petition, the court, without a hearing, issued a temporary writ of injunction against the defendants, and the defendants have appealed from an order of the trial court overruling their motion to dissolve the injunction.

The plaintiffs alleged that the Mona Marie Trust Company was organized for the purpose of developing 80 acres of land out of the H. & G. M. Ry. Company survey upon which an oil and gas lease was held, and any other oil properties that the trust company might own or acquire, for the benefit of the stockholders of said trust. As grounds for the injunction prayed for, plaintiffs alleged that Parker, Renfro, and Overby had come upon the leasehold estate described in the petition, and without the consent and against the wish and desire of said trustees, and without legal authority had erected a derrick at a point about 150 feet from the south line of said leasehold estate aforesaid, and that they were attempting to and engaged in the laying of a line of water pipes for the purpose of drilling a well at said point; that said location was immediately between the plaintiff's location theretofore made and the derrick erected by the plaintiff at a cost of $800, for the purpose of drilling a well. That the derrick was located 300 feet from the plaintiff's south line, and that Jim Parker knew that plaintiff had made a location for

the drilling of a well 300 feet from its south line, under and by virtue of an agreement with the Magnolia Petroleum Company, who owned the lease adjoining plaintiff's lease. Plaintiff further alleged that the defendants had established armed guards at the place of their avowed purpose to drill, who kept watch over said premises day and night, and that they were trespassers and without authority of law, and were willfully and maliciously and without permission and consent of the trustees of plaintiff doing and performing the things therein averred.

Plaintiff further alleged that it had entered into a contract with defendants Renfro and Overby, by virtue of which said defendants agreed to drill three wells on the lease to the 900-foot sand, and that if the well then being drilled by the Magnolia Petroleum Company should be a producing well, and make 100 barrels per day or over, the defendants agreed to drill one of the wells to the 1,600-foot sand; that all of the expenses connected with the drilling of these wells were to be borne by the defendants Renfro and Overby, and in payment therefor the plaintiff, through its trustees, agreed to transfer and assign $25,000 of its stock or units, the company being capitalized for $50,000; that this contract was entered into on the afternoon or night of January 11, 1922; that under said agreement the $25,000 worth of stock was to be placed in escrow with one of the local banks, together with a copy of the contract, and that upon the compliance by the defendants with their agreement to drill the wells according to the terms of the contract said stock was to be turned over to the defendants; that the defendants agreed to pay $1,750 in money to the plaintiff, one-third of which was to be paid cash, one-third in 60 days, and one-third in 90 days; that under said agreement plaintiff agreed to elect J. H. Renfro as one of its trustees, the declaration of trust providing for three trustees and one of them having resigned; that said contract was a personal one, and made by plaintiff because of the confidence and reliance of its trustees in said Renfo and because said trustees believed at the time that Renfro would faithfully and diligently fulfill the terms of said contract in person, and would assist, aid, and advise the other trustees of said trust estate·in carrying out the purposes of said organization and in getting the most that was possible for the stockholders out of said trust estate. That had it not been for the confidence and personal trust in the defendants Renfro and Overby, and especially Renfro, they would not have made the contract with them. It was further alleged that the trustees were induced to enter into the contract by certain alleged false and fraudulent statements and conduct of defendants Renfro and Overby in leading the trustees to believe that the well then being drilled by the Magnolia Petroleum Company would not make a good producer, and that the driller in charge of said well had placed armed guards around it, and would not allow the trustees, or any one else, to visit the well in order to determine the character of production promised.

It was further alleged that the contract made with the ·defendants was nonassignable; that on the 12th day of January, 1922, defendants Renfro and Overby sold and assigned all their right and interest in said contract to defendant Jim Parker; that said Parker was a man of bad reputation, and not a suitable person to be associated with them as trustees of said trust estate, and that he had been charged with violation of the criminal statutes of the state, and was not a safe counselor and advisor; and that plaintiff's trustees did not confide in him, and would · never have entered into a contract with Parker of the character of the one they made with Renfro and Overby.

Defendants answered by a general demurrer, and, further answering as to the writ of injunction only, they alleged that they had purchased $25,000 of the stock in said company, the same supposed to have been one-half of the stock of said company, and that defendants Renfro and Overby owned said one-half of the stock, and were given the right to drill three wells on the premises, in accordance with the contract made with the plaintiff's trustees, and that subsequently, on the 16th day of June, 1922, they transferred and assigned all their right and interest in and to said contract to defendant Jim Parker, and that said Renfro and Overby further agreed to fulfill and comply with the contract they had theretofore made as to the drilling of the wells, and they retained the right of supervision over the drilling until the completion of said wells. Such other allegations, by the plaintiff and defendants, as will be necessary to notice, will be mentioned hereafter in the course of this opinion.

Only two grounds to sustain the injunction need be noticed: First, that the contract made with the defendants Renfro and Overby was nonassignable; second, that by reason of the fraudulent statements and concealments of said Renfro and Overby the contract was voidable and subject to rescission.

The contract by the plaintiffs and defendants Renfro and Overby is as follows:

"The State of Texas, County of Wichita:

"Memorandum of agreement this day entered into between Mona Marie Trust, an unincorporated trust estate of Wichita county, Texas, acting herein by and through its trustees, W. E. Priddy and J. B. Hatchitt, party of the first part, and Joe Overby and J. H. Renfro, both of Wichita county, Texas, parties of the second part, witnesseth:

"1. Party of the first part agrees to sell, assign, and deliver unto parties of the second part twenty-five thousand dollars of its capital stock

upon the following conditions and for the consideration hereinafter stated, as follows:

"Second party agrees and hereby obligate themselves to pay to first party the sum of seventeen hundred and fifty dollars in cash as follows: $583.35 in cash, the receipt of which is hereby acknowledged, and to make and execute their two promissory notes each in said sum of $583.35, payable in sixty and ninety days after date; said notes to bear interest at ten per cent. per annum after maturity, and providing the usual default and attorney's fees clauses; second parties further agree and bind themselves at their own cost and expense, to drill, complete and fully equip three additional wells on the leasehold estate of first party, and being the eighty acres out of the Roberts' land near Electra, all to the nine hundred foot sand now producing oil in the two wells on said property; and said wells are to be drilled diligently, and in all respects to comply with the drilling and development obligations contained in the original lease, under which first party now holds its said estate; but it is further stipulated that in the event the Magnolia test, now being drilled near the aforesaid lease, shall produce on completion as much as one hundred barrels flush production, then second parties obligate themselves to drill and complete one of the three wells above mentioned to the depth and to the sand found in said Magnolia well; and such well when so drilled shall be in lieu of the three wells aforesaid.

"First party agrees to immediately issue all of the aforesaid stock in favor of second parties and to place the same in escrow with a copy of this contract with Wichita State Bank & Trust Company of Wichita Falls, Texas; and upon the faithful compliance herewith by second parties they shall then become entitled to have such stock delivered over to them.

"It is further understood and agreed, that upon a faithful compliance with this contract by second parties, they shall then be entitled to participate in any dividends accruing to said stock from the date of its issuance; that is to say, the transaction shall be considered as having been on the date of the issuance of same.

"But it is further expressly understood and agreed that in the event second parties shall fail or refuse to faithfully carry out this contract then in that event they shall forfeit to first party said sum of seventeen hundred and fifty dollars, and any and all work, services and materials they may have expended on the lease aforesaid, as well as liquidated damages accruing to first party on account of the breach hereof and such money, work material and services so forfeited is not to be deemed a penalty, but as actual damages now ascertained as accruing to first party for the reason aforesaid; and upon such breach any such note given as hereinabove mentioned, though not due by its terms, shall, at the option of first party, be subject to be declared due and payable.

"Witness our hands this January 11, 1922. Mona Marie Trust, by J. B. Hatchitt, W. E. Priddy, Trustees, First Party. J. H. Renfro, Joe Overby, Second Parties."

It will be noted that there is nothing in this written contract touching the agreement alleged by the plaintiff that the other trustees would elect Renfro as a third trustee of the trust estate. It is not alleged that said Renfro and Overby were practical drillers, and it does not appear from the evidence in the case that either one of them had had any experience in drilling oil wells, or that they had a practical knowledge thereof which would have made them particularly fitted for such work. Renfro testified:

"I do not know whether or not he [Priddy] cared that we supervise it. I guess he would have preferred that I not supervise it. I never drilled any oil wells, and my partner, Mr. Overby, drilled none that I know of. I do not know whether or not Mr. Overby had any active oil well drilling experience."

[1] The evidence shows that Renfro was selling lubricating oil in Wichita county at the time the contract was made. There seems no other testimony as to the experience of either Renfro or Overby in drilling oil wells. While the trustees of the trust company might have preferred Renfro to Parker as a third trustee, it does not appear from either the contract between the plaintiff and Renfro and Overby and the contract of sale between Renfro and Overby and Parker that any mention was made of the agreement by plaintiff to make Renfro a trustee. Therefore we do not see why this contract should be held nonassignable. While the assignments would probably not relieve Renfro and Overby of the duty to see that the wells were drilled according to specifications, yet an agreement to do this was subsequently made by them in the contract between them and Parker. In Galey v. Mellon, 172 Pa. 443, 33 Atl. 560, the Supreme Court of Pennsylvania held that a contract for the drilling of an oil well was assignable. In Corpus Juris, vol. 5, page 383, it is said:

"The mere fact, however, that a contract calls for the performance of labor or service is not sufficient to render it unassignable, if from a consideration of the entire contract it appears that only a certain result was contracted for, and not the personal labor of the promissor."

In the case of Devlin v. Mayor, 63 N. Y. 8, the court of last resort of New York discusses at length the question of what sort of contract was assignable and what nonassignable. In this case it is said:

"If the service to be rendered or the conditions to be performed is not necessarily personal, and such as can only with due regard to the intent of the parties, and the rights of the adverse party, be rendered or performed by the original contracting party, and the latter has not disqualified himself from the performance of the contract, the mere fact that the individual representing and acting for him is the assignee, and not the mere agent or servant, will not operate as a rescission of, or constitute a cause for terminating the contract."

In Galey v. Mellon, supra, it is said:

"This action is founded upon a contract for drilling an oil well. The personal performance of the work by the legal plaintiff could not have been contemplated by the parties at the time the contract was made. The work, of necessity, required the labor and attention of a number of men; and it does not appear that because of his knowledge, experience, or pecuniary ability, or for any other reason, Galey was especially fitted to carry it on. There is nothing of a personal nature about it, and its personal performance by him was not the inducement nor of the essence of the contract."

See, also, La Rue v. Groezinger, 84 Cal. 281, 24 Pac. 42, 18 Am. St. Rep. 179; Carter v. State, 8 S. D. 153, 65 N. W. 422; Rochester Lantern Co. v. Stiles, 135 N. Y. 209, 31 N. E. 1018; Atlantic & N. C. R. Co. v. Atlantic & N. C. Co., 147 N. C. 368, 61 S. E. 185, 23 L. R. A. (N. S.) 223, 125 Am. St. Rep. 550, 15 Ann. Cas. 363; Simpkins on Contracts and Sales (3d Ed.) p. 398.

We do not think that under the facts of this case the contract to drill the wells was nonassignable, because involving personal skill of the defendants Renfro and Overby, or any confidence reposed in them by the trustees of the plaintiff. But it is claimed: That the plaintiff was entitled to rescission of the contract with Renfro and Overby by reason of certain fraudulently concealed facts and certain fraudulent statements and representations made by Renfro and Overby to Priddy relative to the value of the oil properties possessed by the leasehold estate, in this, that the Magnolia Petroleum Company, on the date of the contract, to wit, January 11, 1922, was drilling for oil on its lease, which adjoined the lease of the plaintiff herein. That on said date said Magnolia Petroleum Company discovered oil in its said well, which said well was being drilled as an offset, or in close proximity to the plaintiff's 80-acre lease. That said well flowed oil by heads, and was a splendid well, a much greater producer than was expected, and caused all leases in that immediate vicinity to suddenly increase in value, and caused said plaintiff's lease and leasehold estate of 80 acres to immediately increase in value; that the trustees of the plaintiff herein were not aware that such a well had been discovered by the said Magnolia Petroleum Company, and the said Renfro and Overby were in possession of these facts at the time of the making of said contract, and concealed said facts from the trustees of the plaintiff in this manner. That the said Renfro and Overby stated to the trustees of the plaintiff that the said Magnolia Petroleum Company had bailed a little oil out of said well, and that it had guards out, and would not allow anybody to go nearer than 200 yards of its well, and when one of the trustees of the plaintiff herein suggested that they go by said well, on the way from the plaintiff's lease to Wichita Falls, the said Renfro and Overby declared to said trustees that it would be useless, because they would not allow any one to go near the well, or ascertain any facts about the nature and character of its production. That said statements were false and untrue. That they were made for two purposes, to wit: (1) to induce the trustees of the plaintiff herein to believe that said well was not much of a producer, if a producer at all, because it was generally known in the oil fraternity, and in the Wichita Falls oil district especially, that such conduct and such methods generally indicated that there is no oil, or that such well is not much of a producer and to induce the trustees of the plaintiff to believe that it was not much of a producer, and possibly no well at all, and thereby induce the plaintiff to enter into a contract with them such as was entered into: (2) for the further purpose of concealing from this plaintiff and its said trustees the true condition of said well, in keeping the trustees away from said well, so that it would not know the true condition and the true status of said well, but would believe that it was not much of a well, and thereby readily enter into the contract that was made; that these concealments and these false and fraudulent statements were material; and, had this plaintiff's trustees known of the true condition and the true facts as they did exist at said well, they would never have made the contract that they did make with the said Renfro and Overby.

J. H. Renfro testified on this point as follows:

"On the 11th I was there when the well showed signs of oil. Mr. Overby happened to be at my house, and wanted to go to Electra, and I took him out with me; I was up there selling lubricating oil, for my company. I said, 'Let's go over by the lease over here and see if they want any gasoline sent out and see how they are coming on with the well.' We went over and in the course of the conversation we were talking to Mr. Priddy and he was there at the lease at that time. After we were there about 30 minutes, I asked him if he knew anything about the well; I had been out by the Magnolia well; I had been out there a few days or a week before that, to the Magnolia well, and they were about 1,500 feet, and everybody thought that they would have to go about 1,900 feet to that Powell sand, before they got anything. I said, 'They have had time to get down to that Powell well sand, and I believe that I will go by there and see how they are getting on.' That was before I had seen the well that day. I then went right straight to the Magnolia well. When we got to the Magnolia well, we went upon the derrick, on the derrick floor, and as we walked up they were coming out with a bailer, and I noticed a little oil falling off the cable on the derrick there, and they bailed out some oil. I think they ran the bailer twice while I was there; it might have been that was the only time; I cannot say defi-

nitely. I saw oil in the bailer, and saw the well flow. It bailed out at first, while we were looking at the oil in the trough there, the slush pit trough, we were discussing as to whether it was live oil or dead oil, and while we were doing that there was a little head of oil came up, kinder died down, and then it came up a little bit more. I think it was about 5 or 6 feet high. I just figured that there was a little pocket of gas in there, made a little showing of oil; I did not know what it would do.

"Since I had this proposition under way, I did not wait to see what the well was going to do; I thought that it looked like it would make a good well, and I went back too. Well, in the meantime I was talking; let me see—I wanted to see Mr. Altman, up there, this driller, about sending out some stuff; he gave me an order, I wanted to see when to send this oil out, and went back up there to see him, and when I was talking to him, Mr. Priddy came up and began to talk to me. That was when I tried to get him to go ahead with the previous promises he had made to me.

"As to the driller saying anything about putting us off when we came up there, he said, 'We did not see you until you were right up here; if we had seen you coming we would have run you off.' He made this statement, he said, 'I wish that you would not say anything about this, as I am going to try to keep everybody away from here, until I get some stock or buy some acreage. I told him that I had a contemplated trade on at that time. From what he stated it was my impression that he was not going to let any one come about the well. He said that he would not have let us in if he had known we were coming. When I went back there, I simply asked Mr. Priddy, as I had been waiting till Doc Overby came back, to decide on this contract. Well, I told him that Joe Overby was with me, and from the outlook he had decided he would take Doc over this part in the proposition, and that I thought that he would go ahead with it, that I would talk it over with him and see what he had decided. I do not think I told him then that they had struck a showing of oil down there in the well; it was about an hour later when I came back. I went up to Electra.

"He [Priddy] would not sign that instrument when I brought it down there to him. He said when I saw him the first time, when I went back to see him about going ahead with the contract, after I had talked to Joe Overby, I asked him if he was ready to go ahead with that contract now, and he said that he was, said well; I said I would see my parties and see if they are still ready to go ahead. That was after I had seen the well. I asked him to see if my parties were still willing to go ahead. I said: 'Will you give us an option?' No; I said: 'How long will you give me to find out whether my parties are ready to go ahead or not?' And he said: 'I will give you an option to-day.' That was on the 11th. I said: 'All right; I can find out if Mr. Overby is ready to take a half interest, or if I will have to get somebody else to go in with me.' I said: 'I will find out to-day what I will be able to do.' Mr. Overby did not go back up there with me. He said: 'I will wait down here, and we will go on.' And I went by and got him, and he agreed to just exactly what this contract stood for.

He said: 'We will go on up to Electra and get a form and draw it up and go ahead and have the thing fixed up to-day.' He said: 'This well looks like it might be a good one; we might as well go ahead.'

"We went to Electra, and had that fixed, and came down by his place; to Fowlkes station about four miles. As to whether or not he would sign that instrument, after we had it prepared, he said: 'That is all right,' he said, 'I will stand by my word, if the well comes in.' I forgot just what he stated, whether it was either 1,000 or 1,000.000 barrels, but he said: 'We will go down to Wichita Falls and see Mr. Hatchitt.' He said: 'I have another trustee with me.' I thought at the time that he was the only man who had anything to do with the proposition, because he was the only man I had ever had this deal up with. As far as I knew, he had complete control of the property. I did not know anything about Mr. Hatchitt until he said he had a trustee who was a lawyer, said that he would probably want to pick a lot of flaws and one thing another; he said that he believed that he would go down there and have him draw up another contract.

"At that time I told him that the well was making a showing. I told him that they had bailed up some oil down there. I told him that I believed that the well was going to make a good well. I told him that several times before we signed the contract. I did not tell him anything about a guard. I told him that the driller told us, he said he was not going to let anybody else come down there, and Mr. Priddy said that he believed that he would go by the well. I told him that I did not believe that it would do any good; I did not believe that the driller would let him come, because he said he would not. I believed what the driller told me."

Overby testified substantially as did Renfro as to what occurred at the Magnolia well, except he stated that after Renfro left the oil flowed one time to a height of some 15 or 20 feet. He further testified that it was about 200 or 300 yards from where Priddy was to the Magnolia well.

W. E. Priddy testified as follows:

"It was on that day that we had this conversation. He [Renfro] came back the second time and wanted to make a trade along that line. I asked him why he was so insistent; asked him if they had struck oil in the Magnolia well. He said they had a showing of oil down there, but had guards out, and no one could get to the well. The only statement that he made to me was that they had bailed a little oil out of the well; he did not state any amount. I said: 'Let's go down there and see this well.' He said: 'These guards won't let us go to the well and it would be useless.' I asked him how came him to get to see this well, and he said that he and Overby had got to this well before the fellows knew it; in fact they had slipped in there and got on the derrick floor, and had seen the well before they had a knowledge of their presence. * * *

"They said they had seen the Magnolia well. I did not know that it had been flowing oil. They did not tell me they had seen it flow oil. They said that they had a little oil; that they

had bailed a little oil out of the well. Had I known at the time that the Magnolia well was flowing oil, I would not have verbally agreed with him, subject to Mr. Hatchitt's consent, to have made any such trade as that. Mr. Renfro told me that we could not get nearer than 200 yards of the well."

Priddy further testified: That when they started to Wichita Falls he suggested that they drive by the Magnolia well. That there was a road leading out on the southwest corner of plaintiffs' lease which ran close to the Magnolia well. That Renfro said: "You can't see anything. I think that we had better go the road to the west, there is an outlet to the west." That they did not go by the well.

H. H. Hall testified that he was drilling the Magnolia well; that he did not know Renfro and Overby before that time, but on January 11th they came to the well and introduced themselves; that the well was not flowing when they came up but that it flowed while they were there. He further testified as follows:

"It was a pretty nice showing. It wasn't much, just run over. It would come up perhaps 5 or 6 feet high, and then when it cleared itself possibly it went up from 15 to 20 feet. It was a nice showing for an oil well. * * *

"I don't know how many times we bailed in, I judge three or four times. I do know when these boys first came up. I was pulling the bailer when they first came up on the derrick floor. I had oil in the bailer when they first came up. I judge Renfro stayed there about 20 or 30 minutes, and this other one stayed there just a little longer, if I remember right.

"At the time they came up, I was the driller in charge, and I told them that if I had known that they were coming up I would not have let them in. I told them in a joking way that I was not going to let any one else come up, but I did not have any authority. I will admit that I told them that. I did not say that I was going to put out guards; I told them I was going to keep them away if I could, and I did ask these boys not to say anything about it, about them having slipped in. I told them not to say anything to anybody about this well coming in. I told them I had a little acreage in view. I did not tell them I was not going to let anybody else come on the derrick floor and see it. I told them that if we could prevent it, I would like for nobody else to come down there. They were already on the floor. I could not tell what size well that was. * * *

"I had run a couple of bailers, and I got oil in both bailers; it would flow a little. When I agitated that well, it would flow a little. It did not flow a great deal as long as either one of them was there. These boys could not tell anything about what size or quantity of oil we were going to get, unless they were awful good experienced oil men. I could not tell, and I have been drilling five years.

"I judge that they stayed there about 20 or 30 minutes. We did not have any guards there to keep people away from there at any time; never had any. I told them that if I had known they were coming up, I would have had the tool dresser to go out and keep them slugged away."

Much testimony as to these allegations of fraudulent statements and concealments is in the record, but we have given substantially the basis of plaintiff's contention of fraud. Pomeroy's Equity Jurisprudence, vol. 2, p. 1612, §§ 902, 903, says:

"Sec. 902. Concealment becomes fraudulent only when it is the duty of the party having knowledge of the facts to discover them to the other; and this brings back the question. When does such duty rest upon either party to any transaction? All the instances in which the duty exists, and in which a concealment is therefore fraudulent, may be reduced to three distinct classes. These classes are, in general, clearly distinct and separate, although their boundaries may sometimes overlap, or a case may fall within two of them: 1. The first class includes all those instances in which, wholly independent of the form, nature, or object of the contract or other transaction, there is a previous, existing definite, fiduciary relation between the parties, so that the obligation of perfect good faith and of complete disclosures always arises from the existing relations of trust and confidence, and is necessarily impressed upon any transaction which takes place between such persons. Familiar examples are contracts and other transactions between a principal and agent, a client and attorney, a beneficiary and trustee, a ward and guardian, and the like. 2. The second class embraces those instances in which there is no existing special fiduciary relations between the parties, and the transaction is not in its essential nature fiduciary, but it appears that either one or each of the parties, in entering into the contract or other transaction, expressly reposes a trust and confidence in the other; or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied. The nature of the transaction is not the test in this class. Each case must depend upon its own circumstances. The trust and confidence, and the consequent duty to disclose, may expressly appear by the very language of the parties, or they may be necessarily implied from their acts and other circumstances. 3. The third class includes those instances where there is no existing or fiduciary relation between the parties, and no special confidence reposed is expressed by their words or implied from their acts, but the very contract or other transaction itself, in its essential nature, is intrinsically fiduciary, and necessarily calls for perfect good faith and full disclosure, without regard to any particular intention of the parties. The contract of insurance is a familiar example. It will be found, I think, that all cases of fraudulent concealment may be referred to one or the other of these classes.

"Sec. 903. As instances of concealment are most frequent in contracts of sale, it will be proper to apply the foregoing general doctrine to the vendee and the vendor. The decisions recognize a marked difference between the two,

with reference to their duty to disclose. The contract of sale is not intrinsically fiduciary, and does not fall within the third of the foregoing classes. The conclusion is clearly established that under ordinary circumstances, there being no previously existing fiduciary relation between the parties, and no confidence being expressly reposed by the vendor in the very contract, no duty rests upon the vendee to disclose facts which he may happen to know advantageous to the vendor—facts concerning the thing to be sold which would enhance its value, or tend to cause the vendor to demand a higher price, and the like; so that a failure to disclose will not be a fraudulent concealment. The reason is evident. The law assumes that the owner has better opportunities than any one else to know all the material facts concerning his own property, and is thus able under all ordinary circumstances to protect his own interests. The duty to disclose can rest upon the vendee only when the case belongs either to the first or the second of the above-mentioned classes. If, therefore, there is a confidence reposed by the vendor in the vendee, by reason of some prior existing fiduciary relation between them, the vendee's failure to disclose a material fact would undoubtedly be a fraudulent concealment. Also, if, during the negotiation and conclusion of the sale, confidence is expressly reposed in the vendee, or if from the circumstances of the contract and the acts of the parties such confidence is necessarily implied, the vendee's silence might be a fraudulent concealment. In instances of the latter kind, a much stronger and clearer case of confidence and consequent duty to disclose is necessary against the vendee than would be required under analogous circumstances against the vendor."

In Boyd v. Leith (Tex. Civ. App.) 50 S. W. 618, it is said:

"Appellants' fourth assignment of error complains of the appellate court in sustaining plaintiff's special exception to the fifth section of his amended answer which alleges 'that W. J. Newcom and plaintiff formed a conspiracy to defraud him and others in Cooper, Tex., out of the value of their lands; that they were then the agents and officers of the Texas Midland Railroad, and had been sent to Cooper, Tex., as the agents of said road, to get a bonus for said railroad, and the right of way through Delta county; that the defendant and the people of Cooper, Tex., did not know at the time that they were the agents and officers of said railroad, and did not know the road was fixing to build to Cooper, Tex.; that for the purpose of defrauding the people of Cooper, Tex., and especially defendant, out of his lands, they kept their business to themselves until they had purchased a large number of acres of land in and around Cooper, Tex., and had taken a deed from defendant to his 40 acres, and during this time the said J. E. Leith, for the purpose of defrauding, went at the time by the name of Lain, and claimed to be a boot and shoe man from Dallas, and thereby deceived the public; that by reason of the Texas Midland Railroad's proposing to build its road to Cooper, Tex., lands were greatly of more value to the people of Cooper than they knew, and defendant's 40 acres was then worth $4,000, but he did not

know the same, but plaintiff did, and he sold his land for $2,000, whereupon he says that, if the 40 acres was incumbered as plaintiff alleges, defendant ought not now to be compelled to pay the same.' The court did not err in sustaining the plaintiff's exceptions to this part of the defendant's answer. The fact that Leigh and Newcom were the agents and in the employ of the railroad and by virtue of such employment and agency they obtained knowledge that the railroad intended to construct its road to Cooper and through the county of Delta, 'and that they kept such knowledge and their business to themselves until they had purchased a large number of acres of land in and around Cooper, and had taken a deed from defendant to his 40 acres,' did not constitute fraud upon their part. They were under no obligation to defendant to disclose such knowledge previous to purchasing his land. They occupied no such relation to defendant as required a disclosure of these facts. 1 Story, Eq. Jur. §§ 204–207. Nor does the fact that Leith went by the name of Lain in conducting the negotiations with defendant affect the matter."

[2, 3] We think the testimony of Priddy as to the statements made to him by Renfro with reference to the Magnolia well and its condition at the time, substantially agrees with the testimony of the driller H. H. Hall, except that Renfro did not state to Priddy that the well had flowed. It appears that the well flowed only 5 or 6 feet while he was there. Priddy and Renfro were dealing at arm's length, and it was not incumbent upon Renfro to disclose to Priddy the facts that he had learned with reference to the Magnolia well. Nor do we think that actionable fraud was practiced by Renfro, when Priddy suggested that they go by the well, and Renfro replied that he did not think there was any use, because they would not see anything. We think that the testimony of Hall reasonably supported Renfro's statement that the Magnolia people would not allow further visitors to the well at this time, even though this statement by Renfro was upon a matter in which he was called upon to speak the truth. Tillitson on Contracts, vol. 1, § 413, p. 767, and authorities cited under note 69; sec. 418. Under section 419 of this work it is said:

"The argument is made that if the performances in a bilateral contract are intended to be concurrent, or if the performance by the assignor is to precede the performance of the other party to the contract, no injustice is done by upholding the assignment; but if performance of the part of the assignor, by the terms of the original contract, is to follow the performance on the other side, the assignment cannot be permitted, since the credit given to the assignor was personal to himself, and justice requires that the other party to the contract should not be compelled to perform and trust to the credit of the assignee. This argument assumes that an assignment of a bilateral contract involves a true assignment of duties; that is, the substitution of a new duty on the part of the assignee, instead of the original

duty assumed by the assignor to the other party to the contract. It cannot be admitted that this is the true meaning of assignment. Novation is the word appropriate to such a changed relation, and, as appears from the next section, an attempt by one party to force a novation on the other party to a contract will excuse the latter, but unless the assignor repudiates a continuance of his liability on the contract after the assignment, it does not seem a valid objection that the performance of the assignor is not due until after the performance of the other party to the contract."

Therefore we conclude that the injunction granted cannot be sustained on the ground that the contract was procured by fraud. Since these two grounds seem to be the only ones which the plaintiff below relied, it follows that the judgment of the trial court in overruling the motion to dissolve was error. The judgment is therefore reversed, and the injunction vacated.

We do not deem it necessary to decide whether the general demurrer of defendants should have been sustained.

Reversed and rendered.

## On Motion for Rehearing.

We have carefully considered the motion and note the contention made: (1) That we erred in going into the facts and deciding the case on them, since our only duty was to determine whether the trial court was authorized in concluding that the writ should not be dissolved, or whether he abused his discretion in refusing to dissolve it; (2) and that this court failed to recognize the distinction made by the authorities between mere silence on the part of a party to a contract, when he is under no obligation to disclose certain facts known to him and unknown to the other party, and positive misrepresentations as to such facts.

[4] We recognize the rule to be that it is not the province of an appellate court to pass upon the merits of the case on an appeal from a temporary injunction or from a refusal to dissolve a temporary injunction. We appreciate this rule, but it seems to us in the consideration of this case on original hearing that the facts did not show a reasonable ground upon which the trial court, in the exercise of his admitted discretion, should have refused to dissolve the writ. Only so far did we intend to go, and our opinion on original hearing is to be so construed. We did conclude that the balance of convenience was with the appellants, and that under the facts shown they would likely have been more injured by the continuance of the injunction than the appellees would have been by the failure to continue it. As to whether in a trial on the merits plaintiffs or defendants below should prevail, we express no opinion.

The motion for rehearing is overruled.