Louise T. Meighan appeals from a summary judgment entered in favor of Watts Construction Company and James E. Watts[1]
constituting a holding that her suit against Watts was barred by the six-year statute of limitations. We reverse.
The motion for summary judgment was submitted on the pleadings; written interrogatories, and answers thereto; the depositions of Mrs. Meighan, F.H. Ashley, and James Watts; and documents produced in discovery proceedings. All of these disclose that Mrs. Meighan, of 613 Reynolds Street, Gadsden, executed, on 15 June 1973, under seal, a deed of easement. This occurred because the City of Gadsden was to put in a new storm sewer pipeline near her property and residence. By this deed, Mrs. Meighan conveyed to the City a permanent easement upon a portion of her property for the construction and maintenance of a permanent storm sewer drainage pipeline, and also a temporary construction easement upon another portion of her property to afford ingress and egress to the permanently installed pipeline, and for piling dirt, stone, gravel, and other such substances while excavations were being made. This instrument, executed by Mrs. Meighan under seal, also provided:
 "It is further expressly understood by and between the said parties that the City of Gadsden shall be responsible for restoring said premises . . . as near as practicable to their original condition immediately following each such use of the land."
The bid opening for this construction project, Reynolds Street-Haralson Avenue Storm Sewer Project, was scheduled by the City for 19 June 1973. Watts Construction Company was awarded the contract. The contract consisted of several documents: an instrument labeled "Contract," dated 5 July 1973; a performance bond executed by Watts under seal; a labor and material payment bond, executed by Watts under seal; a bid form dated 21 June 1973; various change orders, and the voluminous "Specifications Contract Documents." These documents imposed upon Watts certain obligations regarding repair of damage to, and protection of, adjoining property. Watts, in the course of this project, undertook to restore to the original condition homeowners' premises that had been damaged or altered. There were no other contractors, or any city construction workers, that undertook to do this restoration or replacement work.
In that connection, Watts took up and replaced the driveway on Mrs. Meighan's property. At times, Watts had a number of employees and various heavy equipment on Mrs. Meighan's premises.
In the fall of 1981, Mrs. Meighan first noticed a drainage problem at her home. She saw a small crack that began in the brick wall under her living room window which kept expanding as time passed. She hired F.H. Ashley, a building contractor, who examined it and gave her an estimate of damages in April 1982. Mr. Ashley testified there were cracks in the wall the size of two hands, and a window was so skewed there was paper, rock, and other matter present around the window larger than one's fist.
Ashley commenced work to attempt the repair of the damage and further, to find the cause of the problem. He determined that a drain pipe which ran across the front and down the side of her house had been crushed or mashed. The site of the crushed or collapsed drain pipe was under the driveway which had been replaced by Watts during the 1973 construction work. This crushed pipe, after the driveway was replaced, gradually filled with dirt and became blocked. The water that had formerly drained through this pipe backed up, causing the damage to the wall and the foundation. In Ashley's expert opinion the pipe had been crushed with a heavy piece of machinery while the driveway was being *Page 831 
replaced. Cost of the repairs done by Ashley was $23,731.07.
Mrs. Meighan states the issues to be:
 "Whether there is a scintilla of evidence establishing contractual obligations of Watts to Mrs. Meighan arising from the `deed of easement' instrument.
 "Whether there is a scintilla of evidence establishing contractual obligations of Watts to Mrs. Meighan arising from the Watts-City construction contract instruments."
Crucial to a determination of these issues is resolution of the question of whether the instruments are deemed to be under seal so that applicable statute of limitations is ten years.
Watts contends they are not and says the six-year statute of limitations is applicable. Watts, in answer to the complaint, specifically denied that it was delegated, and assumed the duties, responsibilities, and obligations of the City to Mrs. Meighan. Watts further contends there was no assignment of the sewer project contract to Watts by the City, and further, that the contract was separate and apart from the deed of easement, the performance bond, and the labor and material payment bond. This contention rests primarily upon Article 4 of the "Contract," which states:
 "ARTICLE 4. Contract Documents. The Contract shall consist of the following component parts:
a. This Instrument
b. General Conditions
c. Special Conditions
d. General Scope of Work
e. Technical Specifications
f. Drawings"
Reference to the "Performance Bond" shows:
 "Whereas, Contractor has by written agreement . . . entered into a contract with Owner for Storm Sewer Project, Reynolds Street-Haralson Avenue . . . which contract is by reference made a part hereof, and is hereinafter referred to as the CONTRACT."
Reference to the "Labor Material Payment Bond" shows:
 "Whereas, Principal [Watts Construction] has by written agreement . . . entered into a contract with Owner [The City of Gadsden] for Storm Sewer Project, Reynolds Street-Haralson Avenue . . . which contract is by reference made a part hereof, and is hereafter referred to as the CONTRACT."
Regarding the contention that Watts was not delegated, and did not assume the duties, responsibilities, and obligations of the City, we find the record quite revealing. The specifications and contract documents contain, among others, the following provisions:
"105.23 CARE OF THE WORK
 "a. The contractor shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work and shall be responsible for the proper care and protection of all materials delivered and work performed until completion and final acceptance, whether or not the same has been covered by partial payments made by the City of Gadsden, and whether or not the damage to his work was caused by the Contractor or by other contractors, or by others than the employees of the City of Gadsden in the course of their employment.
". . .
 "d. The Contractor shall avoid damage as a result of his operations to existing sidewalks, streets, curbs, pavements, utilities, adjoining property, the work of other contractors and the property of the City of Gadsden and others, and he shall at his own expense completely repair any damage thereto caused by his operations.
 "e. Wherever required by law, the Contractor shall shore up, brace, underpin, secure, and protect as may be necessary all foundations and other parts of existing structures adjacent to, adjoining, and in the vicinity of the site, which may be in any way affected by the excavations or other operations connected with the *Page 832 
construction of the Project. The Contractor shall be responsible for the giving of any and all required notices to any adjoining or adjacent property owner or other party before the commencement of any work. The Contractor shall indemnify and save harmless the City of Gadsden from any damages on account of settlements or the loss of lateral support of adjoining property and from all loss or expense and all damages from which the City of Gadsden may become liable in consequence of such injury or damage to adjoining and adjacent structures and their premises.
". . .
"105.27 REMOVAL OF DEBRIS, CLEANING, ETC.
 "The Contractor shall, periodically or as directed during the progress of the work, remove and properly dispose of the resultant dirt and debris, and keep the premises reasonably clear. Upon completion of the work, he shall remove all temporary construction, facilities and unused materials provided for the work, and put the project and premises in a neat and clean condition and do all cleaning and washing required by the Specifications. Trash and combustible materials shall not be allowed to accumulate on the premises. Trash will be burned only on sites, as directed by the Engineer, and provided by the City of Gadsden.
". . .
"SCOPE OF WORK
". . .
 "107.1 This general scope of work division of the General Specifications is applicable to all work called for by the specifications and the drawings.
 "107.2 The project site of the Storm Sewer Project, Reynolds Street-Haralson Avenue, consists of the area in the City of Gadsden, Alabama, within the right-of-ways and public easement areas as shown on the drawings, or as may be procured by the City of Gadsden, and as follows:
 "Reynolds Street-Haralson Avenue Storm Sewer from a point 150', more or less, west of Reynolds Street to a point 210' east of Haralson Avenue.
 "This project consists of installing a storm sewer system, including inlets, manholes, etc., at locations shown on project plans and in accordance with these specifications. Included in the project shall be reconstruction on any fences, walls, etc., damaged or removed during pipe installation and the re-establishment of landscaping: i.e., shrubs, grassing, etc., disturbed by construction.
". . .
 "It shall be the Contractor's responsibility to provide protection, by whatever means necessary, to protect adjacent structures and properties during execution of this project.
"107.3 RESPONSIBILITIES OF THE CONTRACTOR
 "a. Except as otherwise specifically stated in the General Specifications, the Contractor shall provide and pay for all material, labor, tools, equipment, lights, heat, power, transportation, superintendence, temporary construction of every nature, taxes legally collectable because of the work, and all other necessary services and facilities of every nature whatsoever necessary to execute the work to be done under the contract and deliver it complete in every respect within the required time.
"107.4 WORK NOT INCLUDED IN THE CONTRACT
 "a. There is no work shown on the drawings or mentioned in the specifications which shall be excluded from the Contract. However, some landscaping items are not shown in the estimate of quantities. It shall be the contractor's responsibility to re-establish grass, shrubs or other landscaping features disturbed by project construction.
"DIVISION 201
"DEMOLITION AND CLEARING
"201.1 SCOPE
 "a. This division includes the demolition of existing curb and gutter, curbing, valley *Page 833 
gutter, paved surfaces, and the clearance and/or removal of drainage structures, street signs, mail boxes, trees, stumps and roots, shrubbery, and any other items within the right of way which are necessary to be removed, cleared, or demolished in order to perform the work as shown on the drawings and as herein specified.
 "201.2 CURB AND GUTTER, CURBING, AND VALLEY GUTTER, DEMOLITION OF.
 "a. Curb and gutter, curbing, and valley gutter which is shown on the plans to be removed, shall be carefully removed to the extent that is shown on the drawings with due care taken to not disturb any structures adjacent which are to be retained. Any similar adjacent structures which are disturbed will be restored to [their] original condition without any additional cost to the owner.
". . .
 "201.3 STREET SIGNS AND MAIL BOXES, REMOVAL AND REPLACEMENT
 "b. Mail boxes, paper delivery boxes, and other items which are owned by the adjacent property owners, and which are necessary to be removed in order to construct the work shown on the drawings or as herein specified, will be removed by the Contractor and delivered to the owner to whom it belongs. The owner shall be notified in advance of the time when it will be necessary to remove these items.
". . .
"201.6 EXISTING PAVED DRIVEWAYS, REMOVAL
 "a. All existing paved driveways extending into the right of way, shown to be removed, shall be carefully and neatly severed without damage to the adjacent material, at the right of way line, or other line as directed by the Engineer, and removed from the site."
By virtue of these documents, and other evidence, it is clear that Watts's contention is not well founded. We think the better reasoned view is that expressed by the Supreme Court of North Carolina:
 "In most states, the assignee of an executory bilateral contract is not liable to anyone for the nonperformance of the assignor's duties thereunder unless he expressly promises his assignor or the other contracting party to perform, or `assume,' such duties. See Langel v. Betz, 250 N.Y. 159, 164 N.E. 890 (1928); 3 Williston, Contracts, § 418A (3rd ed. 1960); Note: Obligations of the Assignee of a Bilateral Contract, 42 Harv.L.Rev. 941 (1929). These states refuse to imply a promise to perform the duties, but if the assignee expressly promises his assignor to perform, he is liable to the other contracting party on a third-party beneficiary theory. 4 Corbin, Contracts, § 906 (1951). Cf. McGill v. Baker, 147 Wn. 394, 266 P. 138 (1928). And, if the assignee makes such a promise directly to the other contracting party upon a consideration, of course he is liable to him thereon. See Simpson, Contracts, § 132 (2d ed. 1965).
 "A minority of states holds that the assignee of an executory bilateral contract under a general assignment becomes not only assignee of the rights of the assignor but also delegatee of his duties; and that, absent a showing of contrary intent, the assignee impliedly promises the assignor that he will perform the duties so delegated. 3 Williston, Contracts, § 418A (3d ed. 1960); 4 Corbin, Contracts, § 906 (1951). This rule is expressed in Restatement, Contracts, § 164 (1932) as follows:
 "`(1) Where a party under a bilateral contract which is at the time wholly or partially executory on both sides purports to assign the whole contract, his action is interpreted, in the absence of circumstances showing a contrary intention, as an assignment of the assignor's rights under the contract and a delegation of the performance of the assignor's duties.
 "`(2) Acceptance by the assignee of such an assignment is interpreted, in the *Page 834 
absence of circumstances showing a contrary intention, as both an assent to become an assignee of the assignor's rights and as a promise to the assignor to assume the performance of the assignor's duties.' (Emphasis added.)
 "This court has never expressly adopted the Restatement Rule (§ 164) in North Carolina. However, in R.R. v. R.R., 147 N.C. 368, 61 S.E. 185
(1908), decided before the Restatement was written, we apparently recognized the rule of implied assumption that later became the Restatement Rule. In that case plaintiff Railroad had a contract to buy a certain amount of cordwood from one Ives. Plaintiff leased its equipment to Howland Improvement Company and assigned to Howland its contract with Ives. Defendant Railroad (assignee) succeeded to the rights and liabilities of Howland and took an assignment of the Ives contract. Defendant Railroad later changed from wood-burning to coal-burning locomotives and refused to purchase wood from Ives as required by the contract. Thereupon, Ives successfully sued plaintiff Railroad (assignor) for damages caused by defendant's refusal to purchase the wood. Plaintiff assignor then sued defendant assignee for reimbursement and recovery was allowed. Despite the absence of an express promise by defendant assignee to assume the obligations of the Ives contract, this Court treated defendant as having assumed and promised to perform plaintiff assignor's duties under the contract with Ives, saying: `When the defendant bought and took an assignment of this contract for the delivery of so much cordwood on its right of way, and thus acquired the right to enforce performance by Ives or recover damages for its breach, it assumed the liability to pay for it when delivered. It should not take over the benefits of the contract without bearing its burdens. Defendant took the contract cum onere. . . .' Thus, R.R. v. R.R., supra, recognizes that there is an implied promise of assumption which arises from acceptance of a general assignment. However, the case fails to recognize the limitation, later adopted by the Restatement, that such a promise is implied only in the absence of circumstances showing a contrary intention. We think the rule as limited by the Restatement is sound. We therefore adopt the Restatement rule and expressly hold that the assignee under a general assignment of an executory bilateral contract, in the absence of circumstances showing a contrary intention, becomes the delegatee of his assignor's duties and impliedly promises his assignor that he will perform such duties.
 "The rule we adopt and reaffirm here is regarded as the more reasonable view by legal scholars and textwriters. Professor Grismore says:
 "`It is submitted that the acceptance of an assignment in this form does presumptively import a tacit promise on the part of the assignee to assume the burdens of the contract, and that this presumption should prevail in the absence of the clear showing of a contrary intention. The presumption seems reasonable in view of the evident expectation of the parties. The assignment on its face indicates an intent to do more than simply to transfer the benefits assured by the contract. It purports to transfer the contract as a whole, and since the contract is made up of both benefits and burdens both must be intended to be included. It is true the assignor has power only to delegate and not to transfer the performance of duties as against the other party to the contract assigned, but this does not prevent the assignor and the assignee from shifting the burden of performance as between themselves. Moreover common sense tells us that the assignor, after making such an assignment, usually regards himself as no longer a party to the contract. He does not and, from the nature of things, cannot easily keep in touch with what is being done in order properly to protect his interests if he alone is to be liable for nonperformance. Not infrequently the assignor makes an *Page 835 
assignment because he is unable to perform further or because he intends to disable himself for further performance. The assignee on the other hand understands that he is to carry out the terms of the contract, as is shown by the fact that he usually does, most of the decided cases being those in which the other party objected to performance by the assignee. In view of these considerations is it not reasonable to infer that the assignee tacitly promises to perform?' Grismore, Is the Assignee of a Contract Liable for the Nonperformance of Delegated Duties? 18 Mich.L.Rev. 284 (1920). See Note, Obligations of the Assignee of a Bilateral Contract, 42 Harv.L.Rev. 941 (1929); 4 Corbin, Contracts, § 906 (1951)."
Rose v. Vulcan Materials Co., 282 N.C. 643, 194 S.E.2d 521
(1973).
Under the documents in evidence and the actions upon the part of Watts in performing the work designated in those documents, it is clear that the duties and responsibilities were delegated to and assumed by Watts. It is also clear that Watts undertook to fulfill those obligations, duties, and responsibilities for the benefit of Mrs. Meighan and others similarly situated. It is also clear that Watts, not the City, enjoyed the benefits granted under the deed of easement giving rights of access to Mrs. Meighan's property for the purpose of carrying out what the assigned contract called for: construction and restoration.
All of the above being true, it is evident that Mrs. Meighan may maintain an action to recover damages for Watts's failure to perform the obligations imposed by the contract, as we have defined it to be, as a third-party beneficiary of that contract made for the benefit of her and those similarly situated.
We therefore hold the ten-year statute of limitations to be the one applicable in this case and reverse the judgment below and remand this case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
[1] The defendants shall be referred to as "Watts."