547 So.2d 1159 (1989)
CITY OF BIRMINGHAM
v.
COCHRANE ROOFING & METAL COMPANY, INC., et al.
86-1187.
Supreme Court of Alabama.
March 10, 1989.
Rehearing Denied June 30, 1989.
*1160 Charles Cleveland of Cleveland & Cleveland, Birmingham, for appellant.
W. Eugene Rutledge and Kay S. Kelly, Birmingham, for appellee Cochrane Roofing & Metal Co.
Thomas A. Carraway of Rives & Peterson, Birmingham, for appellee Warren, Knight & Davis.
James H. Starnes and E. Martin Bloom of Starnes & Atchison, Birmingham, for appellee Robins Corp.
J. Gusty Yearout of Yearout, Meyers & Traylor, Birmingham, for amicus curiae Associated General Contractors of America, Alabama Branch, Inc.

ON APPLICATION FOR REHEARING
ADAMS, Justice.
The original opinion in this case is withdrawn, and the following opinion is substituted therefor:
This is an appeal by the City of Birmingham (hereinafter "the City") from the summary judgments entered in favor of the architect, the general contractor, and the roofing subcontractor for the Birmingham Municipal Airport Terminal Building. The building was certified as substantially complete by the architect, and on April 27, 1973, the City formally accepted the building. On March 9, 1983, the City sued the architect, the general contractor, and the roofing subcontractor, as well as the supplier of the roofing subcontractor, as well as the supplier of the roofing materials, for breach of contract and negligence. The complaint alleged that these parties had failed to properly design and install the roof on the airport terminal building. The trial court granted a summary judgment in favor of each defendant, except the supplier of the roofing materials, on the grounds that the claims against them were barred by the applicable statute of limitations. The court certified these summary judgments as final judgments pursuant to Rule 54(b), A.R.Civ.P. We affirm.
The City had plans to expand the Birmingham airport. On November 6, 1968, the City entered into a contract with Warren, Knight & Davis, Architects, Inc. (hereinafter "WK & D"). The contract required WK & D to design an airport terminal; to see that the structure was built in accordance with the contract documents; to represent the City during the construction of the terminal; and to certify when the project was substantially completed.
Subsequently, the City entered into a contract with Robins Corporation (hereinafter "Robins"), a general contractor, for the construction of the airport terminal *1161 pursuant to the plans and specifications of WK & D. That contract included a bid bond dated March 9, 1971. It also included a performance bond and a labor and material bond, each dated May 8, 1971. Each of the bonds was under seal, although the contract itself was not. Robins also gave a one-year warranty guaranteeing all workmanship and materials.
On May 19, 1971, Robins subcontracted the roofing work on the airport terminal to Cochrane Roofing and Metal Company (hereinafter "Cochrane"), who agreed to construct the roof and give a two-year warranty.
GAF Corporation (hereinafter "GAF") supplied the roofing materials and routinely inspected the roof as it was being installed by Cochrane. GAF gave a ten-year warranty on the workmanship and the roofing materials.
Construction of the roof began in November 1971. The roof on the terminal building had an unusual design and used "state of the art" roofing materials. It was described in a GAF report as a "butterfly roof with crickets to interior drains." The roof of the rotunda was shaped like a funnel. In describing the material used to construct the roof, GAF wrote on its warranty: "Tarred Felt, Coal Tar Pitch and Gravel Surfaced Asbestos Felts, Asphalt and Gravel Surfaced." The unusual design, combined with the quality of the materials available on the United States market at that time, caused several problems during the installation of the roof. Specifically, asphalt roofing material is a petroleum-based product. As a result of the severe energy crisis occurring at that time, the asphalt on the market in the United States was of unusually poor quality. Nonetheless, the roof was completed and GAF made its final inspection of the roof on March 13, 1973.
There were three separate guarantees on the building and materials. Robins gave a one-year warranty guaranteeing workmanship and materials, dated March 30, 1973; Cochrane gave a two-year warranty for workmanship and materials, dated March 9, 1973; and GAF gave a ten-year warranty on the workmanship and the roofing materials, dated March 19, 1973.
On March 22 and 23, 1973, WK & D inspected the building and found several problems, none of which was related to the roof. The repairs were made and on April 26, 1973, WK & D certified that the building had been substantially completed. The City accepted the building the following day. The City began operating the building in November 1973, and has stated that the leaks in the roof occurred almost immediately.
After designing the building, the architect's duty to the City under the contract was to visit the site; to observe the work in progress; and to become generally familiar with the construction to see that the contractor's work was going to be in conformity with the construction documents at its completion. The contract between the City and WK & D did not include post-construction services. Nevertheless, after the City formally accepted the building as complete, WK & D assisted the City with its problems, at no cost to the City. In fact, from the record, it appears that the City was not charged by any of the defendants for their attempts to repair the roof.
Subsequent to the completion and acceptance of the building, WK & D was contacted regarding problems with the roof. After WK & D responded to that problem, the airport manager started calling WK & D every time there was a problem. Generally, when the roof began leaking, the airport manager would contact WK & D. Typically, WK & D would inspect the roof and then contact Robins, who, in turn, would contact Cochrane. Cochrane, who had warranted the roof for two years following its completion, initially made the necessary repairs. WK & D's actions were limited to inspecting the roof and contacting the proper parties to repair the roof.
GAF made its standard "two-year" inspection of the roof in October 1974. It noted several problems, and Cochrane, pursuant to its warranty, made the repairs. After these repairs were made, Cochrane did nothing else with regard to the roof *1162 until 1977. GAF was not contacted again until 1979.
From approximately 1977 to 1979, WK & D was contacted by the City many times. After the City called, WK & D would contact Robins and Cochrane. All three cooperated in the effort to repair the roof, at no cost to the City, although no one acknowledged responsibility for causing the problems. In March 1977, at the request of the City, WK & D inspected the roof and then wrote a letter outlining the problems. The letter, which was sent to Robins and the City's aviation director, suggested that Robins contact Cochrane and have Cochrane make the necessary repairs. Cochrane was contacted and made the repairs, even though its warranty had expired. The City contacted WK & D again in December 1977 and requested that it inspect the roof. WK & D inspected the roof and wrote Robins another letter outlining the problems. In January 1978, WK & D was called again, this time to find a particular leak. WK & D located the leak and Cochrane repaired it.
In late January, apparently frustrated with the circumstances, Cochrane wrote to Robins, stating:
This is to advise you that we feel that we have gone far beyond the limits of our liability as it concerns the roof of the terminal building. We have in effect been maintaining the roof since its completion in March of 1973. There is a manufacturers inspection and service guarantee in force on the roof of this building. The owner should advise the manufacturer whenever a roof problem is experienced. The manufacturer would have its representative investigate the complaint and then would take the appropriate action under the terms of the guarantee.
In February 1979, the City wrote WK & D a letter, stating in pertinent part: "I suggest you, Robins and the roofing contractor get together and have these problem areas corrected.... We have had leaks throughout the building; some of which have been corrected and some of which have not.... We are not satisfied with this roof at all. It has given us nothing but trouble from the time the building was occupied." As a result of that letter, a meeting was held by representatives of all of the parties in this lawsuit. The purpose of the meeting was to determine the cause of the leaks and to find some method of preventing new leaks in the future. Additional repairs were made following the meeting, but a few leaks continued.
Following that meeting, WK & D wrote to the City, stating:
As of this time we have failed to receive any criticism of the way in which our drawings were prepared or the specifications written. Therefore, it results that the problem lies within the scope of the contractor's work or that of his subcontractors. It is the feeling of this office that Robins Engineering did a masterful job at the Birmingham Airport. Mr. Sizemore, Mr. Forrester and the roofing contractor, Mr. Cochrane, all made extra efforts to perform their work in a first quality manner. This office has no criticism of the Robins Corporation; however, we hope you realize that the true problem lies with the materials on the market at the time the Terminal was constructed and with the problems of the mechanical installation of the roof by its nature.
Please be advised that this office will continue to work with you and assist you and your personnel in any problem at the Birmingham Airport to which we feel we can contribute any help whatsoever.

(Emphasis supplied.)
On January 23, 1980, all of the parties in this lawsuit, except the roofing supplier, met again to discuss the problems. By December 1981, the City decided to replace the entire roof. The roof was partially replaced in 1983, ten years after its installation and after the ten-year warranty had expired. Note, however, that although the City experienced problems, the defendants did not charge the City for the repairs. Furthermore, the roof was warranted only for ten years, and the City did obtain ten years' use from the roof.
*1163 This lawsuit was filed on March 9, 1983, nine years and eleven months after the building was certified by the architect to be complete and the building was accepted by the City. The trial court granted summary judgments in favor of WK & D, Robins, and Cochrane, on the ground that the six-year statute of limitations on the breach of contract claim had expired. Ala.Code 1975, § 6-2-34. We affirm.

STATUTE OF LIMITATIONS AS TO THE CLAIMS AGAINST WK & D AND COCHRANE
The appellant claims that the trial court erred in granting WK & D's and Cochrane's motions for a summary judgment, because, it argues, the statute of limitations had not expired on March 9, 1983, the date the City filed its breach of contract and negligence[1] claims. We disagree.
The statute of limitations in a claim based on contract begins to run when the cause of action accrues, Ala.Code 1975, § 6-2-30; not when the contract is entered. See Stephens v. Creel, 429 So.2d 278 (Ala. 1983). In a claim based on breach of warranty to construct a building in a workmanlike manner, the cause of action accrues, and the statute of limitations begins to run, on the date that the defendant completes performance, because "[b]y its very nature it is the failure to construct the house in a workmanlike manner that constitutes the breach." Stephens, 429 So.2d at 280.
A claim based on contract is subject to a six-year statute of limitations. Ala. Code 1975, § 6-2-34. There is no question that WK & D certified completion of the project on April 26, 1973, and that the City formally accepted the building as complete on April 27, 1973. At that point, because the contract did not include post-construction services, WK & D had fulfilled its obligations pursuant to its contract.
On the authority of Stephens, supra, we must conclude that the City's claim against WK & D was barred by the statute of limitations, as of April 27, 1979. (See our discussion, infra, of the question of estoppel to assert the statute as a defense.) Furthermore, because the City readily admits that it was aware of problems with the roof from "day one," the concerns expressed by the dissenting opinion in Stephens are not present.[2]
Cochrane had given a two-year warranty for workmanship and materials, executed on March 9, 1973. Assuming, for the sake of argument, that Cochrane did not complete performance under its contract until the expiration of the two-year warranty, a cause of action against Cochrane would not have accrued until March 9, 1975; thus, the statute of limitations would have expired on March 9, 1981. This lawsuit was not filed until March 9, 1983; therefore, the trial court correctly concluded that the claim against Cochrane was barred by the six-year statute of limitations. (See our discussion, infra, of the question of estoppel to assert the statute as a defense.)

STATUTE OF LIMITATIONS ON THE CLAIM AGAINST ROBINS
The City asserts that the performance, bid, and labor and material payment bonds were under seal and were incorporated into the construction contract by reference, and therefore, that the ten-year statute of limitations for contracts under seal was applicable. Ala.Code 1975, § 6-2-33. The City relied on this Court's decision in Meighan v. Watts Const. Co., 475 So.2d 829 (Ala. 1985), to support its argument. We conclude that Meighan is distinguishable from the instant case, and we affirm.
*1164 In Meighan, the City of Gadsden obtained a deed of easement, which was under seal, from a property owner. The instrument also provided:
It is further expressly understood by and between the said parties that the City of Gadsden shall be responsible for restoring said premises ... as near as practicable to their original condition immediately following each such use of the land.
Meighan, 475 So.2d at 830.
Thereafter, the City entered into a contract with a general contractor for the installation of a sewer pipeline on the easement. The contractor also executed a performance bond and a labor and material payment bond, both of which were under seal and incorporated the contract by reference.[3] The contract between the city and the contractor also required the contractor to restore the property owner's land to its original condition. About eight years after the work was completed, the property owner discovered a crack in her foundation, which had been caused by a crushed pipe beneath her driveway where the contractor had been working. The property owner sued the contractor to recover for the damage.
The contractor contended that the six-year statute of limitations applicable to simple contract actions barred the claim against him. See § 6-2-34. The owner claimed that the applicable statute of limitations was ten years, because her deed of easement to the city was under seal. See § 6-2-33. The contractor responded by arguing that the deed of easement to the city and the sealed bonds were separate from his contract with the city to perform work on the sewer line; therefore, he argued, he was not bound by the deed of easement.
This Court held that the contract was not separate from the deed of easement. Moreover, this Court stated:
Under the documents in evidence and the actions upon the part of Watts in performing the work designated in those documents, it is clear that the duties and responsibilities were delegated to and assumed by Watts. It is also clear that Watts undertook to fulfill those obligations, duties, and responsibilities for the benefit of Mrs. Meighan and others similarly situated. It is also clear that Watts, not the City, enjoyed the benefits granted under the deed of easement giving rights of access to Mrs. Meighan's property for the purpose of carrying out what the assigned contract called for: construction and restoration.
Meighan, 475 So.2d at 835. Therefore, the ten-year statute of limitations for contracts under seal was applied.
In the instant case, the City would have us believe that Meighan held that when a sealed bond and an unsealed construction contract incorporate each other by reference, the entire agreement is deemed to be under seal and, therefore, that the applicable statute of limitations is ten years. Meighan does not stand for that proposition. Although the opinion in Meighan quoted the incorporation by reference language from the bonds, that was not the reason that the Court concluded that the applicable statute of limitations was ten years. Rather, the Court reasoned that although the deed of easement was actually conveyed to the city, the city had assigned the instrument to the contractor, who undertook the duties and obligations of the city to restore the property to its original condition. As the third-party beneficiary of the assigned contract between the city and the contractor, the owner had standing to sue the contractor. Because the original deed of easement was under seal, the assigned contract was deemed to be under seal; therefore, the Court held that the contractor was subject to the ten-year statute of limitations. Meighan, supra.
Unlike Meighan, in the instant case there has been no assignment of a sealed contract. *1165 Because the assignment was the basis of the holding in Meighan, that case is distinguishable from the instant case.
Having concluded that Meighan does not answer the question posed to this Court, we must determine whether the construction contract between the City of Birmingham and Robins is deemed to be under seal by virtue of the fact that there were three sealed bonds and an unsealed construction contract that incorporated each other by reference.[4] After a careful consideration of the purpose for having contracts under seal, as well as the parties' intent and the applicable public policy concerns, we conclude that the construction contract was not deemed to be under seal.
Before simple contracts were recognized, a promise or a gratuitous release made in writing, signed, and containing the maker's seal, constituted a binding agreement upon delivery. Williston on Contracts, § 5 at 17 (3d ed. 1957). A seal was not only a means of identification in addition to the signature, but signified the authenticity of the contract, see C.J.S. Contracts, § 63 at 738 (1963), and attested to the execution of the instrument, Black's Law Dictionary 1210 (5th ed. 1979). In fact, "[p]rior to the time the law required consideration to support a contract, the seal was used conclusively to establish the authenticity and binding effect of the instrument to which it was attached." Williston on Contracts, § 5 at 17 note 5 (citations omitted).
Most modern contracts are not under seal, except as required by statute or ordinance. A bond is an example of a contract that is typically required to be under seal. In fact, "[a]t common law the distinguishing characteristic of a bond [was] the presence of a seal which served to import greater solemnity than was accorded to the ordinary written contract." Williston on Contracts, § 220A at 800.
In this case, because this was a public works contract, Robins was required to furnish a performance bond and a labor and material payment bond to the City. See Ala.Code 1975, § 39-1-1. Robins posted three sealed bonds in its contract with the City. The bonds were signed and sealed by a representative of Robins, as the principal on the bond, and by a representative of the bonding company, as surety on the bond. In accordance with § 39-1-1, Robins posted a performance bond, which contained the following language with regard to the contract:
... for the CONSTRUCTION OF THE TERMINAL BUILDING (CONTRACT A) BIRMINGHAM MUNICIPAL AIPORT, BIRMINGHAM, ALA.... a copy of which said contract is incorporated herein by reference and is made a part as if fully copied herein.
The labor and material bond and the bid bond contained similar language. Likewise, the construction contract used comparable language to incorporate the bonds into the contract.
The City claims that because the bonds are under seal, the incorporation language in both the bonds and the construction contract causes the entire agreement to be under seal. We disagree.
To begin our analysis, we must determine whether the parties intended for the construction contract to be under seal. With the exception of the language in the bonds incorporating them into the contract, we find nothing that could lead us to conclude that the parties intended for this contract to be under seal.
First, contracts are typically not under seal unless a seal is expressly required either by law or by one of the contracting parties. In this case, the owner did not require the construction contract to be under seal, and no state law required it. In addition, if the parties did intend for the contract to be under seal, they could have sealed the contract in the same manner by which the bonds were sealed.
Furthermore, given the purpose for posting a sealed bond, it is probable that the parties intended only the bonds to be *1166 under seal. A performance bond and a labor and material bond are required to insure that parties supplying material, labor, and so forth, for construction are paid by the general contractor, or, if he fails to pay, by his surety. A bond is necessary in public works contracts because materialman's liens are not permitted on public projects. See Sumlin v. Hagan Storm Fence Co., 409 So.2d 818 (Ala. 1982); Headley v. Housing Authority of Prattville, 347 So.2d 532 (Ala.Civ.App.1977).
A bond is basically an insurance contract executed by the principal and his surety, but for the benefit of a third party (the subcontractors and suppliers). The City was not a party to the bond instrument, yet, because the bonds were required by law, and because they were incorporated into the construction contract, the City depended on the bond's validity. Historically, the seal on the bond provided assurance that the bond was a valid and enforceable agreement between the principal and his surety; thus, the City and the subcontractors could be more confident in relying on the bond. However, although extra assurance was necessary with the bond, it was unnecessary in the construction contract, because the City was a party to that contract. For these reasons, bonds are typically sealed, but simple contracts are not.
Aside from the intent of the parties, there are at least two public policy reasons justifying our conclusion that the contract is not deemed to be under seal by virtue of the fact that the bonds are under seal. First, if we held that the incorporation by reference of a sealed bond into an unsealed construction contract deemed the entire agreement sealed, then we, in effect, would be denying the parties the freedom to negotiate their contract. In other words, every contract requiring a sealed bond would automatically be deemed to be under seal, regardless of the parties' intent. The effect of such a holding would be to increase the statute of limitations on every contract requiring sealed bonds from six to ten years. The length of potential liability is a substantive issue with a potentially profound effect on the parties, especially in terms of their evaluation of their cost based on their risk. If there is no law requiring the construction contract to be sealed, then the parties should be able to decide for themselves whether to place the contract under seal. Finding nothing to evidence an intent on the part of the legislature to require that all contracts containing sealed bonds be under seal, we decline to impose such a requirement.
Furthermore, the legislature has provided a six-year statute of limitations on a simple contract action. This Court cannot change the statute of limitations.
There is also a second public policy concern, which is illustrated by the facts in this case. Assume that we were to conclude that the applicable statute of limitations is ten years for all contracts incorporating sealed bonds. The City filed its lawsuit against Robins more than six years after the building was certified complete and more than six years after Robins's warranty expired. Although the City sued Robins, the lawsuit involved work performed by Cochrane, the subcontractor. However, neither the City nor Robins could sue Cochrane, because the lawsuit was filed more than six years after the contract was completed and the warranties had expired. A claim against Robins, on the other hand, would not be barred. Potentially, Robins could bear full responsibility for Cochrane's actions, without the possibility of recourse against Cochrane.[5] It is unlikely that that result was contemplated by either the City or Robins at the time they entered into the contract. Furthermore, we do not believe that the legislature intended such a result.
Based on the foregoing, we must conclude that the construction contract between the City and Robins is not deemed to be under seal by virtue of the fact that the sealed bonds and the unsealed construction *1167 contract incorporate each other by reference.
This lawsuit was filed on March 9, 1983, more than six years after the building was certified as complete, and more than six years after Robins's warranty expired. For the foregoing reasons, we must affirm the summary judgment in favor of Robins because the statute of limitations period had expired before this lawsuit was filed.

ESTOPPEL
Having concluded that the statute of limitations period had expired as to all parties prior to the March 9, 1983, filing of this lawsuit, we must next consider whether any of these defendants is estopped from raising the statute of limitations as a defense. The City asserts that by cooperating in attempting to repair the roof, the defendants induced the City not to file a lawsuit; therefore, the City argues, the defendants should be estopped from raising the statute of limitations as a defense.
In considering whether these defendants are estopped from asserting the statute of limitations as a defense, we must balance the purpose of the statute of limitations with the injustice that would result from allowing the defendants to claim it as a defense. Noting that the plaintiff waited almost four years after the statute of limitations period had expired to file its complaint, we conclude that it was unreasonable for the City to rely on the defendants' action so as to fail to file its suit within the statutory time.
In Mason v. Mobile County, 410 So.2d 19 (Ala. 1982), this Court held that if a defendant either fraudulently or innocently represents to the plaintiff that he will remedy a problem, and relying on these representations the plaintiff is induced not to file a lawsuit or take any action, the defendant may be estopped from raising the statute of limitations as a defense. Additionally, in Arkel Land Co. v. Cagle, 445 So.2d 858 (Ala. 1983), we held that if a defendant represents that a lawsuit is unnecessary because he intends to take care of the problem he is likewise estopped from raising the statute of limitations as a defense.
The principles set forth in these two cases are still applicable; however, for several reasons, we find it necessary to point out that under the facts of this case, no reasonable person would have allowed the statute of limitations period to expire on the basis that the defendants' actions were inducing it not to file suit. See Ex parte Youngblood, 413 So.2d 1146 (Ala. 1981). First, there is absolutely no evidence that either the architect, the contractor, or the roofing subcontractor fraudulently concealed information or defects with regard to the roof. Furthermore, none of the defendants' statements or letters can be construed as a promise to make repairs in return for a promise not to sue.
There must be some standard of reasonableness in applying estoppel principles. In this particular case, the City readily admits that it was aware of the problems with the roof from "day one." Furthermore, there is no question that the City was aware of its right to sue these parties. Finally, this claim had a six-year statute of limitations, giving the City adequate time to evaluate the likelihood that it would be able to achieve the results it sought. In other words, the City was aware of the roof's problems from the beginning and even though the defendants voluntarily assisted the City in making the repairs, after 5 years and 11 months of assistance the City still did not have what it wanteda roof that did not leak. At that point, no reasonable person would have allowed the statute of limitations to expire, in reliance on the defendants' actions. See Ex parte Youngblood, supra.
Therefore, although the principles of equitable estoppel set forth in Mason, supra, and Arkel, supra, are still valid, we limit that doctrine by requiring a standard of reasonable reliance. See also Youngblood, supra.
Finally, if these equitable principles were taken to their limits they could yield ridiculous results that would, in effect, negate the statute of limitations. For instance, in the construction industry it is conceivable that an owner and an architect could continue some form of working relationship *1168 for ten or more years after a building was certified to be complete. If estoppel prevented the assertion of the statute of limitations as a defense, then the owner could file suit many years after the contract was completed, claiming that he was unsatisfied with the initial design or construction, but that he had been "induced" not to file suit during the years that the architect was either consulting with him or making repairs. Clearly, estoppel was not meant to defeat the statute of limitations defense in every case where a defendant attempts to remedy problems that might otherwise lead to a lawsuit.
There are also public policy concerns we must consider in determining whether to apply estoppel in the manner the City suggests. It makes good business sense to maintain a client's goodwill by assisting him in any way possible, even after the formal contractual relationship has ended. If the statute of limitations defense was defeated as to claims regarding the initial design or construction every time an architect or contractor assisted a client after its performance pursuant to the contract was completed, then the architect or contractor would have no incentive to assist the owner with any subsequent business problems; to do so would only extend its liability. Even if the architect or contractor assisted the owner and a particular problem was resolved, it might not extend its liability only with respect to that problem, but also with respect to every other potential problem in the building. The dilemma is that many reputable businesspersons are willing to attempt to help a client resolve a problem even if they do not believe that they are responsible for the problem. If helping extends liability, then the businessperson is left to struggle between attempting to maintain a good business relationship with the client and protecting his or her business interests by not, in effect, extending the statute of limitations.
In this particular case, if the architect had simply refused to help with the leaky roof, the City would have known immediately that it had to sue, but that would not have solved the problem with the leaky roof. As it was, the City was able to get many individual problems repaired at no cost to it. It seems that this Court ought not to discourage businesspersons from resolving their problems without resorting to the legal system; rather, the legal system should be reserved for those cases where the problems cannot be solved between the parties. Note, however, that none of this is said to negate the principle that one who intentionally or fraudulently misrepresents or conceals information, or who specifically states that there is no need to file a lawsuit because he intends to remedy the problem, can be estopped from asserting the statute of limitations as a defense.

CONTINUING RELATIONSHIP DOCTRINE
The City's final argument on appeal is that this Court should adopt the doctrine of "continuing relationship." Under that doctrine, the statute of limitations would not begin to run until the ongoing professional relationship between the plaintiff and the defendant had ended, even though the duties under the contract had been fulfilled and the work accepted. Under that doctrine, as long as WK & D and Cochrane continued to assist the City in repairing the roof that was constructed pursuant to the contract, the statute of limitations period would not begin to run. This state has not adopted that doctrine, and we decline to do so at this time.
For the foregoing reasons, the judgments are due to be, and they hereby are, affirmed.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; ROBIN'S APLICATION GRANTED; CITY'S APPLCATION OVERRULED; AFFIRMED.
MADDOX, JONES, SHORES and HOUSTON, JJ., concur.

ON SECOND APPLICATION FOR REHEARING
ADAMS, Justice.
The second application for rehearing is denied.
APPLICATION DENIED.
*1169 JONES, SHORES and HOUSTON, JJ., concur.
MADDOX, J., concurs specially.
MADDOX, Justice (concurring specially).
I agree that the application for rehearing should be overruled, because I believe that the opinion correctly states the law, that a contract not under seal does not become one under seal merely by incorporating by reference another contract which was not signed by one of the subject contracting parties, but which was under seal. Meighan v. Watts Const. Co., 475 So.2d 829 (Ala. 1985), has a very narrow field of operation and should be read carefully.
NOTES
[1] The statute of limitations on a negligence claim applicable at the time of this suit was one year. Ala.Code 1975, § 6-2-39 (Repealed 1985). Because the breach of contract claim has a longer statute of limitations, it is unnecessary for us to separately address the negligence claim.
[2] The dissenting opinion in Stephens disagreed with that part of the majority opinion holding that the cause of action accrued on the date the obligations in the contract were completely fulfilled even though the plaintiff did not become aware of the defect in workmanship until years after the statute of limitations had expired.
[3] In Meighan, the performance bond incorporated the contract by reference, stating:

"Whereas, Contractor has by written agreement... entered into a contract with Owner for Storm Sewer Project, Reynolds Street-Haralson Avenue ... which contract is by reference made a part hereof, and is hereinafter referred to as the CONTRACT."
The labor and material bond involved in Meighan contained substantially the same clause.
[4] It is undisputed that the performance, bid, and labor and material bonds are each under seal and it is also undisputed that the contract, considered as a document independent from the bonds, is not under seal.
[5] If the statute of limitations had not expired against Cochrane, the City could still have sued Robins, but Robins could have then sued Cochrane to recover the losses attributable to Cochrane's work.